#### AT THE

### APRIL TERM, 1918.

*(Continued from Volume 275).*

ᵀDA B. W. BOOTH, Appellant, v. S. W. SCOTT et al.

Division One, September 16, 1918.

1. **CONSTITUTIONAL LAW: Title: Private Corporations: Incorporators Chargeable as Partners.** A title which read, "An act to repeal Section 1025, Revised Statutes 1899, and to enact a new section in lieu thereof," said section being a part of the chapter on "Private Corporations" and relating to foreign corporations and the terms upon which they shall be permitted to do business in this State, was broad enough to authorize a provision in the body of the act forbidding the Secretary of State to "license any foreign corporation to do business in Missouri when it shall appear that such corporation was organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State, as it would be a fraud upon the laws of both states, and its pretended incorporators would be held as partners, and as such become liable for the debts of the alleged corporation.·" The clause making the incorporators liable as partners is germane to the title, although it is in the form of a legislative declaration of a familiar principle of the common law rather than in the usual language of a law-making enactment.

276 Mo.] (1)

2. **CORPORATION: Residents of State: Wife Residing in Another State.** The fact that the wife of one of the six persons who undertook to form an Arizona corporation was still sojourning in Dallas, Texas, where she and he had formerly resided, did not make him a resident of a foreign state, in face of the deliberate statement of all the incorporators written upon the face of the articles that he was a citizen of the United States and a resident of Missouri.

3. **———: Of Foreign State: Formed by Residents of this State: To Avoid Laws of This State.** That an Arizona corporation formed by residents of this State was formed for the purpose of avoiding the laws of this State is shown by the fact that its articles of association contained provisions that its principal place of business outside of Arizona shall be Kansas City, Missouri, at which place meetings of the board of directors shall be held and any and all business of the corporation transacted; that its capital stock is to be paid into its treasury at such times as its board of directors shall direct, either in cash, or by the sale and transfer to it of real or personal property, or by services rendered; that the shares so issued shall be fully paid and non-assessable; that the amount of stock is to be one million dollars, of which one-fourth is to be preferred, bearing interest at the rate of seven per cent per annum, the par value being payable five years from date of issue and to constitute a lien on all the property of the corporation; and by the fact that the only purpose for which an office or agent was required in Arizona was to provide opportunity for service of process there; and by the further fact that the corporation was formed for the purchase of a tract of land in Mexico from one of its incorporators without the payment of any part of its capital stock, and that two-thirds of the common stock, or one-half the entire capitalization, was to be taken, without any payment whatever, by the incorporators, while the other third was to be given as a bonus to purchasers of preferred stock at par. The law presumes that one intends the necessary and obvious consequences of his acts.

4. **———: ———: ———: ———: Penal Enactment: Strictly Construed.** The statute forbidding a license to a foreign corporation organized by residents of this State for the purpose of avoiding the laws of this State comes within the police powers of the State, is salutary in its nature, calculated to protect the people of the State from imposition, and is not to be strictly construed against the public and liberally in favor of the corporation on the theory that it is a penal enactment.

5. **———: ———: ———: ———: Transaction of Business in This State: Liability as Partners.** A foreign corporation formed by residents of this State for the purpose of avoiding the laws of this State is forbidden by statute to transact business in this State,

and if it attempts to transact business in this State its incorporators become liable as partners for its debts.

6. ———: ———: **Exclusion: Motive.** Not only has the State plenary power to exclude a foreign corporation from doing business in the State, but its motive for such exclusion cannot be called in question.

7. ———: ———: **Transaction of Business in This State: Fraud.** When the incorporators of a foreign corporation, without a license, establish their principal business office in this State, and proceed with the transaction of its general business from that office and invite people to transact business with them in its corporate capacity, representations to those who accept the invitation that their capitalization has already been subscribed and paid, that the company has received a license from the State, and that they have done every thing required by law to give them a corporate capacity, if untrue, are a fraud upon the laws of the State; and no amount of business, however great, they may subsequently transact, will afford them immunity from liability for their fraudulent transactions.

8. ———: ———: ———: **Void: Restitution; Partial Performance.** All contracts made or attempted to be made in this State by a foreign corporation not licensed to do business in this State as required by the statutes are absolutely void; and being void, its incorporators, who assumed to do business in this State in its corporate name, are to be considered partners as to all its debts and must make restitution in so far as the illegal transaction rests in contract. So that where plaintiff paid $2,000 in cash and gave her note for $3,000 for a tract of land in Mexico attempted to be conveyed to her by said corporation, she is, in the absence of any satisfying proof that the corporation owned the land, or if it did that the deed was sufficient to convey the title, entitled, upon a tender back of the deed, to a judgment against the incorporators for the money paid and cancelling the note.

9. **LAWS OF MEXICO: Transfer of Lands.** There is no presumption that the laws of Mexico pertaining to the transfer or alienation of lands are similar to those of Missouri or of the English common law; and the firmly established rule is that the laws of the state in which land lies govern its descent, alienation and transfer. And in this case the evidence does not show that a deed executed by an Arizona corporation by which it attempted to convey land in Mexico to plaintiff complied with the laws of that country.

10. **LIMITATIONS: Three Years: Forfeiture.** A suit in equity to recover money paid and to have cancelled a note delivered to the incorporators of an Arizona corporation not licensed to do business in this State, on the ground that said transaction was illegal and void and said incorporators are liable as partners, is not an action upon statutes for a penalty and forfeiture, and consequently is not barred by the three-year Statute of Limitations (Sec. 1890, R. S. 1909).

Appeal from Jackson Circuit Court.—*Hon. Kimbrough Stone,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. W. Porter, A. E. Crane,* and *Prince & Harris* for appellant.

(1) The trial court erred in sustaining the demurrer of the defendants to the evidence of the plaintiff on the ground that the facts disclosed do not constitute a cause of action in favor of the plaintiff and against the defendants. (2) The plaintiff was entitled to recover the purchase price of the land, which the respondents attempted to sell to her, because the contract of purchase made with the plaintiff is void by reason of the fact that the Mexican Gulf Land & Development Company, Limited, was and is incapable of contracting in the State of Missouri. (a) The said company was incorporated by the respondents, all of whom were citizens and residents of Missouri, under the laws of Arizona, for the purpose of avoiding the laws of this State, which was a fraud upon the laws of both the States of Arizona and Missouri. Consequently the corporate existence of such a corporation will not be recognized by the State of Missouri. Sec. 3039, R. S. 1909. (b) All such corporations as that represented by the respondents are by said section of the statute positively prohibited from doing business in Missouri under any circumstances. And the respondents assuming to transact business in this State was a wilful violation of positive law and against public policy. All such business transactions were absolutely void for that reason. Ehrhardt v. Robertson Bros., 78 Mo. App. 404; Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404; Parke, Davis & Co. v. Mullett, 245 Mo. 168; Cleaton v. Emery, 49 Mo. App. 345; Davidson v. Hobson, 59 Mo. App. 130; Journal Co. v. Nelson, 133 Mo. App. 482; Hill v. Beach, 12 N. J. Ch. 31; Hyatt v. Van Riper, 105 Mo. App. 664; Donnelly v. Missouri Trust Co.,

144 S. W. 392; Lafferty v. Evans, 17 Okla. 255; Myatt v. Ponca City Land and Imp. Co., 14 Okla.. 220; Empire Mills v. Alston Groc. Co., 15 S. W. 200; Rodman v. Munson, 13 Barb. (N. Y.) 188; Harris v. Larsen, 66 Pac. (Utah) 782; Bank of Atchison County v. Byers, 139 Mo. 627; Martin v. Fewell, 79 Mo. 401; Furniture & Carpet Co. v. Crawford, 127 Mo. 365; Rohan Bros. Boiler Mfg. Co. v. Richmond, 14 Mo. App. 595; Cement Co. v. Gas Co., 255 Mo. 1. (c) The Mexican Gulf Land & Development Company, Limited, was, prior to, at the time of, and long after making the contract in question with the plaintiff, doing business in Missouri within the meaning of Secs. 3039 and 3040, R. S. 1909. Frick v. Marshal, 86 Mo. App. 463; Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404; Chicago Mill and Lumber Co. v. Sims, 101 Mo. App. 569; United States Machinery Co. v. Ramlose, 210 Mo. 631. (3) The second ground upon which the appellant is entitled to recover the purchase price of said land is that there is a total failure of consideration, for two reasons, viz. (a) The deed by which it was attempted to convey said land to this appellant is void for the same reasons that the original contract itself is void. For the validity of a contract, whatever its nature or object, as respects the capacity of the parties, is to be determined by the laws of the State where it was entered into. Bishop on Contracts, sec. 1383; Mutual Life Ins. Co. v. Simmons, 52 Mo. App. 357; 2 Parsons on Contracts, secs. 684, 685, 691; Roeder v. Robertson, 202 Mo. 537; United States Machinery Co. v. Ramlose, 132 S. W. 1133; Lafferty v. Evans, 17 Okla. 254-255; Tri-State Amusement Co. v. Amusement Co., 90 S. W. 1025. (b) Because said deed did not comply with the requirements of the laws of the State of Tamaulipas, Republic of Mexico, where the land was situated. Consequently it would not have conveyed the title of the land described therein even if the deed had been valid under the laws of the State of Missouri, where it was executed and delivered. For it is a well settled principle of law that the force and effect of a deed is to be determined by

the law of the place where the land is situated. Richardson v. DeGiverville, 107 Mo. 422; Depas v. Mayo, 11 Mo. 314; Miller v. Dunn, 62 Mo. 216; 2 Parsons on Contracts (3 Ed.), sec. 470; Bishop on Contracts, sec. 1394. (4) It having been thus fully established that the said contract and deed are both void for three reasons; and that there is a total failure of consideration, it follows inevitably that the appellant has a right to recover the purchase price of said land for two reasons, to-wit: (a) Because the deed being void, the title of said land did not pass from the said company to the appellant. And the title to the land not having passed, the money and note are still appellant's property, and, by reason of that fact, entitled to the possession thereof. United States Machinery Co. v. Ramlose, 132 S. W. 1133; Roeder v. Robertson, 202 Mo. 522; Sparks v. Jasper County, 112 S. W. 271. (b) Because, since, by reason of a void and worthless contract the respondents obtained possession of our money and note without giving us any consideration therefor, in all equity and good conscience, they ought to return the same to us. And out of this moral obligation the law implies a promise on the part of the respondents to return our property to us. And this implied promise on the part of the respondents, we can enforce. Union National Bank v. Lyons, 119 S. W. 549; Roeder v. Robertson, 202 Mo. 522. (5) If a corporation is materially defective in any essential particulars under the statute or common law, its members or stockholders are liable as partners for all of its debts and contracts. Walton v. Oliver, 49 Kan. 113; Beach, Private Corporations, sec. 1-6; Marshall v. Harris, 55 Iowa, 182; Kaiser v. Savings Bank, 56 Iowa, 104; Coleman v. Coleman, 78 Ind. 347; Smith v. Warden, 86 Mo. 382. (6) The trial court erred in finding and holding that the Mexican Gulf Land & Development Company, Limited, is such a *de facto* corporation as could be attacked only by the state which granted its charter. (a) The trial court erred in attempting to give a general application to a rule of law which can only be invoked

in cases where the corporation in question attempted to do business only in the parent state. Tri-State Amusement Company v. Amusement Company, 90 S. W. 1024; Rowden v. Daniell, 132 S. W. 26-27; Ehrhardt v. Robertson Bros., 78 Mo. App. 404; Elliott v. Sullivan, 137 S. W. 290. (b) The contract and deed here in controversy, having been made by the respondents in violation of public policy and positive law, cannot become binding on this appellant by estoppel, and the appellant can take advantage thereof without waiting for action on the part of the State. Parke, Davis & Co. v. Mullett, 245 Mo. 169, 149 S. W. 461.; Williams v. Scullin, 59 Mo. App. 30; Durkee v. People, 40 N. E. 626. (c) The finding and holding of the trial court that the appellant is estopped to call in question the capacity of said corporation to contract in Missouri, if approved by this court, would speedily nullify all the provisions of our statute relative to foreign corporations doing business in this State. Hardy v. Smith, 136 Mass. 332. (d) The trial court had no legal right to consider the defense of estoppel raised by the answers in passing on and determining a demurrer to the evidence of the appellant. 5 Am. & Eng. Ency. Law (1 Ed.), 563; Lee v. Virginia Co., 18 W. Va. 299; Morris v. Indianapolis Ry. Co., 10 Ill. App. 389; Brown v. Atchison Ry. Co., 31 Kan. 1; Bank of Atchison County v. Byers, 139 Mo. 627; Rohan Bros. v. Richmond, 14 Mo. App. 595; Indianapolis Ry. Co. v. McLin, 82 Ind. 435; Ruff v. Ruff, 85 Ind. 431; Morrison v. Berkey, 7 S. & R. (Pa.) 243; Young v. Black, 7 Cranch. (U. S.) 565.

*Robert O. McLin, Bruce Barnett, James T. Montgomery* and *Warner, Dean, McLeod & Langworthy* for respondents.

(1) There was no fraudulent incorporation. The contract was not void so far as plaintiff's rights were concerned, and the defendants are not seeking to enforce any part thereof. The Mexican Gulf Land & Development Company, Ltd., would not be permitted to avoid any part of its contract or its deed by reason of any

default of its own, and the plaintiff could have enforced the contract against the corporation, and has a valid deed to the five hundred acres of land in Mexico. Coal, etc. Co. v. Lead Co., 157 Mo. App. 720; Note Company v. Cement Company, 155 Mo. App. 351; Young v. Gaus, 134 Mo. App. 170; Manufacturing Company v. Construction Co., 124 Mo. App. 363. (2) The contract involved in this was fully executed, and the statute does not affect an executed contract. Manufacturing Company v. Construction Company, 124 Mo. App. 364; Cranor Co. Ltd. v. Miller, 147 Ala. 268; Mobile Electric Light Co. v. Rust, 117 Ala. 690; Dufenbaugh v. Vaughn, 116 Ala. 154; Trust Co. v. Mfg. Co., 222 Fed. 694; Russel v. Jones, 101 Ala. 263. (3) The statute is unconstitutional and void. Sec. 3039, R. S. 1909, was Sec. 1025, R. S. 1899, which did not contain the clause about incorporators being held as partners. The Act of 1903, added the clause about the partnership liability. This act contained more than one subject, and did not contain any reference to the partnership liability in the enacting clause, or title, and violates Sec. 28, Art. 4, of the Constitution which provides that no bill shall contain more than one subject, which shall be clearly expressed in its title. Woodward Hardware Company v. Fisher, 190 S. W. 576. See also: Williams v. Railroad, 233 Mo. 666. (4) The trial court did not hold anything about appellant being estopped. This question was raised by the answers, but the fault here found with the findings of the trial court does not exist. (5) There is absolutely no evidence that this corporation was formed under the laws of Arizona, by citizens and residents of Missouri, for the purpose of avoiding the laws of this State, and such was not the fact. The only evidence on the subject positively and overwhelmingly proves that such was not the case. That fact is not established by the mere residence of the incorporators. State ex rel. v. Cook, 181 Mo. 603. (6) The judgment of the court, dismissing plaintiff's bill, was not error. Plaintiff cannot recover in this cause, for the reason that there is no relation of debtor and

creditor between the plaintiff and the Mexican Gulf Land & Development Company. Wulfing v. Cork Co., 250 Mo. 723. (7) Plaintiff ought not recover in this cause, because the Mexican Gulf Land & Development Company was organized and incorporated under the laws of Arizona and in accordance with such laws to do a lawful business and not for the purpose of avoiding the laws of the State of Missouri. State ex rel. v. Cook, 181 Mo. 596; Webb v. Rockefeller, 195 Mo. 57; Missouri Lead M. & S. Co. v. Reinhard, 114 Mo. 218; Boatman's Bank v. Gillespie, 209 Mo. 217. (8) Granting that the company did not intend to do business in Arizona, that is not of itself sufficient ground for holding its members liable as partners, there being no actual intent to evade the laws of the State of Missouri. 19 Cyc. 1234; Demarest v. Flack, 128 N. Y. 205; Merrick v. Van Santvoord, 34 N. Y. 208; Lancaster v. Amsterdam Co., 140 N. Y. 591; Cumberland Tel. Co. v. Louisville Home Tel. Co., 114 Ky. 892; State ex rel. v. Cook, 181 Mo. 596. (9) The plaintiff could not recover on the ground that the corporation failed to procure a license to do business in Missouri, because the only transactions in Missouri were the sale of the capital stock of the company, which is not doing business within the meaning of the statute. First Natl. Bank v. Leper, 121 Mo. App. 688; Clark v. Petroleum Co., 144 Mo. App. 182. (10) The defendant Montgomery contends that the plaintiff cannot recover against him in any event, for the reason that he severed his connection with the company on the 19th day of February, 1909, and up to that time, the company had transacted no business of any character in Missouri. The company had only, up to that time, sold stock and the plaintiff did not get her deed to the land in Mexico for more than a year afterwards. First Natl. Bank v. Leper, 121 Mo. App. 688; Clark v. Petroleum Co., 144 Mo. App. 182. (11) In this case the plaintiff is asking relief at the hands of a court of equity. Under well known equity doctrines she is not entitled to recover. (a) She is guilty of laches. Secs. 3039 and 3040, R. S. 1909, under which she seeks to

recover, are penal in their nature. Diversey v. Smith, 103 Ill. 378; Cable v. McCune, 26 Mo. 380; 1 Cook on Corporations (6 Ed.), sec. 214 p. 540, sec. 241, p. 654. Under Section 1890 suits based upon penal statutes must be brought within three years, and in this case the suit was brought four years after the plaintiff paid the money and gave the note in question. (b) The plaintiff has not exhausted her remedy against the corporation, and should not be permitted to proceed against the incorporators until she has done so. 1 Cook on Corporations (6 Ed.), sec. 219, p. 566; McClaren v. Franciscus, 43 Mo. 452. (c) The plaintiff being one of the stockholders of the corporation, and having repeatedly dealt with it as such and admitted its legal existence and having sued it as such, is now estopped to deny its existence. Marshall on Corporations, sec. 281, p. 718; Casey v. Galli, 94 U. S. 681; Bank v. Gillespie, 209 Mo. 263; Morawetz on Corporations, sec. 743; Ohio & Miss. Ry Co. v. McPherson, 35 Mo. 26; Kansas City Hotel Co. v. Hunt, 57 Mo. 126. See also: United Shoe Machinery Co. v. Ramlose, 231 Mo. 539. (d) Plaintiff has heretofore elected to sue the company as such in other suits, and should not now be permitted to take an inconsistent position. Young v. Bank of Princeton, 97 Mo. App. 576; Towers v. Compton Hill Improvement Co., 192 Mo. 393; Smoot v. Judd, 184 Mo. 508. (e) The corporation should have been made a party to the suit. Shields v. Barrow, 17 How. 130, 21 U. S. 409. (12) The business in which the company was engaged was interstate and international in its nature, and the Missouri statutes do not control such business. International Text Book Co. v. Gillespie, 229 Mo. 397; International Text Book Co. v. Pigg, 217 U. S. 91; Rogers v. Iron Co., 167 Mo. App. 228; Crutcher v. Kentucky, 141 U. S. 47; State ex rel. v. Grimm, 243 Mo. 667. Stock may be the subject of interstate commerce. Gerger Jones Co. v. Turner, 230 Fed. 239. (13) The defendant, Scott, contends that there can be no recovery against him because (a) he was an incorporator merely as a means of retaining security for the purchase price of

his land, (b) he was not a resident of Missouri where the company was incorporated, and (c) he settled with the company and withdrew before the plaintiff took her deed. Mining Co. v. Coyne, 164 Mo. App. 506.

BROWN, C.—This suit was brought against the above named defendants and one Robert Miller to recover the sum of $2000 and to secure the cancellation of a note for $3000, dated August 3, 1908, payable to the Mexican Gulf Land & Development Company, Limited, one year after its date. It was afterward dismissed as to Miller, for failure to secure service of summons upon him, owing to his absence in Mexico.

The petition alleged that at the time of these transactions the defendants were co-partners doing business in Kansas City, Missouri, under the firm name and style above mentioned, which was represented by defendants both to the public and to plaintiff to be a corporation created by the laws of the Territory of Arizona, authorized to do business in this State, and that the money was paid and the note executed in payment for 500 acres of land in the State of Tamaulipas, Republic of Mexico, to be conveyed to the plaintiff in pursuance of a contract filed with the petition. That a deed in form, at least, was afterward made in said corporate name purporting to convey the same land to plaintiff.

The petition charges that the entire transaction was void and inoperative for the reason, among others, that the entire transaction with plaintiff was conducted and consummated in the State of Missouri, of which plaintiff was a resident; that all the incorporators of the alleged corporation which we have named were residents and citizens of this State and secured their incorporation in Arizona for the purpose of avoiding the laws of this State, and that they have never complied with the laws of this State by securing a certificate authorizing them to do business in Missouri as required by statute. That the deed made and delivered to plaintiff was inoperative and insufficient under the laws of the Republic of Mexico

to convey the lands in question. These things are pleaded with great detail.

The answers are sufficient to put all material allegations of the petition in issue. They also pleaded the limitation of three years applicable to actions upon statutes for penalties, and forfeitures, and certain constitutional defenses to which reference may be made in the opinion. The following agreement is pleaded and in evidence:

"I hereby make application for 50 shares of preferred stock in the Mexican Gulf Land & Development Co., Limited, of the par value of one hundred dollars each.

"These shares of stock are fully paid and non-assessable, and they bear interest from date at the rate of seven per cent per annum, payable annually.

"This stock is due and payable, principle and interest, five years from its date, but is subject to payment by said corporation at any time.

"It is further understood that I have the option of returning my preferred stock into the treasury of said company at any time while I am the holder of the same, and to receive in lieu thereof, a deed for land of said company in the Republic of Mexico, at the selling price. Ten Dollars per acre has been fixed for the first 10,000 acres sold.

"The preferred stock purchased by me is a lien on all of the property belonging to said corporation. It is understood and agreed by the holder of this certificate that the corporation reserves the right to sell any part of said land free and clear of this lien, by reserving, however, five dollars per acre for each and every acre sold, as a sinking fund to pay said preferred stock.

"For each share of preferred stock subscribed and paid for by me, I am to have, free of further charge, one share of the common stock of said corporation.

"I agree to pay the sum of $2000 dollars for said preferred stock upon signing this application, and the balance, the sum of $3000, on or before August 3, 1909.

All checks payable to Mexican Gulf Land & Development Co., Limited.

    "Name   .   .   .   IDA B. W. BOOTH

    "Address   .   .   .   2625 Garfield Ave.

"Date Aug. 3, 1908."

And on reverse side is the following:

"I hereby elect to surrender the preferred stock and take land in lieu of it.

"Aug. 3-1908.

IDA B. W. BOOTH.

"We hereby acknowledge receipt of the within contract, and have filed the same, and agree to make warranty deed to land named to the amount of 500 acres as soon as the same is surveyed; also to issue the common stock provided for in this contract at the next meeting of the board of directors.

"JAMES T. BURNEY, Pres.

"ROBERT MILLER, Secy."

There is little or no controversy about the facts. They are fully developed in the writings in evidence and the admissions of the parties upon the trial. The transaction began in a contract made March 30, 1908, between the defendant Scott of the one part and his six associates in the promotion of the Arizona corporation, and co-defendants in this action on the other, in which they style themselves "promoters of a corporation hereinafter named." It began with a declaration that he, Scott, held a deed to 75,000 acres of land in the State of Tamaulipas, Republic of Mexico, which he sold to the parties of the second part and agreed to deliver to a corporation to be organized by all, to be known as "The Mexican Gulf Land & Development Company, Limited," with an authorized capital of 7500 shares of common stock of the par value of $100 each, and 2500 shares of preferred stock of the same par value; the latter to have no voting power nor voice in the management of the corporation, and all the stock to be paid up and non-assessable. The total consideration for this sale and the conveyance of the land was $150,000 United States gold and 1000 shares of the common stock of

the corporation. For the payment of this, the corporation agreed to set apart 1000 shares of its preferred stock and to sell the same within sixty days and pay from the proceeds $55,000 to Scott within that time; the balance of the proceeds to be set aside by the corporation for expense of promotion and developing the property. The remaining $95,000 of the purchase price was to be secured by the remaining 1500 shares of preferred stock, which was to be sold by the corporation, and sixty-six and two-thirds per cent of the net proceeds to be credited until the $95,000 remaining unpaid to Scott should be fully paid, with interest; the remaining thirty-three and one-third per cent to be retained by the corporation. The preferred stock was to be sold at par, each share to carry a bonus of one share of common stock, so that each purchaser should have a share of each kind for the par value of one of them. Of the remaining 5000 shares of common stock 1000 shares were to then go to Scott and 4000 shares to his co-promoters, share and share alike. If it should not be found necessary to sell all the preferred stock the common stock set aside for the part unsold should also go to the co-promoters. In the meantime the entire issue of preferred stock, with the equal amount of common stock appertaining to it, was to be issued to Scott and by him transferred to the purchasers.

The preferred stock was to bear interest at seven per cent per annum, and to be a first lien upon all assets of the corporation, and be payable five years from its date and redeemable at any previous time after issue. Its lien was subject to the sale of the land under the agreement. In case of default of the co-promoters the thing was to be off.

On May 2, 1908, the promoters already mentioned prepared and signed articles of incorporation for the ''Mexican Gulf Land & Development Company, Limited,'' which were sent to Phoenix, Arizona, and filed in the office of the State Auditor May 12, 1908, at 2:30 p. m. This act is relied upon for the creation of the corporation. It was signed and acknowledged by all the

promotors on May, 2, 1908, at Kansas City, Missouri. It begins with the statement of their intention to form a corporation under the laws of Arizona. The principal place in the Territory of Arizona in which the business of the corporation was to be transacted was Phoenix, and its principal place of business outside Arizona was the City of Kansas, Jackson County, Missouri, "at which place meetings of the board of directors of the corporation may be held and any and all business of the corporation transacted, and the corporation may have such other branch office either within or without the Territory of Arizona as may be established by the board of directors, where meetings of the board of directors may be held and where any and all business of the corporation may be conducted."

Its business included practically everything that could be done by individuals within the United States and Mexico.

Its capital stock was stated at one million dollars, one-fourth of which was to be interest bearing preferred stock, "due five years from its date and payable at any time after its issue at the option of the company; said preferred stock to have no voting power." The articles further provided as follows:

"Said capital stock shall be paid into this corporation at such time as the board of directors may direct, either in cash, or by the sale and transfer to it of real or personal property, or for services rendered for the uses and proposes of said corporation, in payment for which shares of the capital of said corporation may be issued, and the capital stock so issued shall thereupon and thereby become and be fully paid up and non-assessable, and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased or services rendered shall be final and conclusive."

The commencement of the corporation was fixed at the time of the filing of the articles in the office of the territorial auditor.

Its affairs were to be conducted by a board of seven directors, and the board named for the first year consisted of the original defendants in this suit. The officers were to consist of a president, vice president, secretary and treasurer, to be elected annually, and those appointed by the articles for the first year were James T. Burney, president; James T. Montgomery, vice president; Robert Miller, secretary; and Leon H. Schwald, treasurer, all of whom were stated to be residents of Missouri.

The private property of the stockholders was exempted from liability for corporate debts, and "every certificate of capital stock issued by this corporation shall show upon its face in plain words that such stock is fully paid up and non-assessable."

Thomas J. Prescott of Phoenix, Arizona, was named as "the agent for the said corporation for the Territory of Arizona, upon whom all notices and legal processes, including services of summons, may be served until said corporation, by certificate in writing, shall designate some other bona-fide resident of said city and territory to act as its agent for the purpose above mentioned."

These articles were signed by all the incorporators. In the Arizona incorporation no attention was given to conformity with the laws of Missouri. Conformity with the laws of Mexico seems to have been a more serious matter. They secured the services of a Monterey lawyer of distinction, General Lavaro Garza y Ala, and received information that the laws of that Republic required, as a condition of corporate existence there, that the capital stock should be fully paid in the purchase of the land. Using the words of the president of the corporation in his testimony, "we must show that our capital stock had been paid up by the purchase of the land on the start, and that the seller of the land should receive all the stock for his land, and then he might do as he pleased with it." To conform to this requirement a meeting of the corporators in their capac-

ity of first board of directors was held at Laredo, Texas, on August 19, 1908, at which Scott presented an amended proposition to the board so modified as to express the idea that he was to receive the entire capital stock of the company on practically the same terms as were expressed in the contract on March 30th while his six associates were to "promote said corporation and its business affairs for a working interest therein on the lines herein proposed." Their interests remained the same as proposed in the original contract, except that they were to retain five shares each as their qualifying interest. When this was done Scott was ready to deliver the deed. They went across the Rio Grande to Laredo, Coahuila, Mexico, where the matter was "fixed up" before a notary.

In the meantime a campaign seems to have been inaugurated to raise the money by the sale of preferred stock and lands to meet the terms of the Scott contract. The plaintiff was a client of the president, and in her testimony she says he was also her business adviser. On a visit to her at her residence she told him that she had $2000 to invest for a limited time and asked for his advice. He said he would call again, and did so, and presented to her the matter of investment in the Mexican project. He pressed this with persistence, bringing Doctor Scott with him upon one occasion, and providing her with advertising literature favorably presenting the character and prospects of the investment. The result is expressed in the following application for preferred stock, in which the terms of the certificates are correctly set forth:

"I hereby make application for 50 shares of preferred stock in the Mexican Gulf Land & Development Co., Limited, of the par value of one hundred dollars each.

"These shares of stock are fully paid and non-assessable and they bear interest from date at the rate of seven per cent. per annum, payable annually.

276 Mo. 2.]

"This stock is due and payable, principal and interest, five years from its date, but is subject to payment by said corporation at any time.

"It is further understood that I have the option of returning my preferred stock into the treasury of said company at any time while I am the holder of the same, and to receive in lieu thereof, a deed for land of said company in the Republic of Mexico, at the selling price. Ten Dollars per acre has been fixed for the first 10,000 acres sold.

"The preferred stock purchased by me is a lien on all of the property belonging to said corporation. It is understood and agreed by the holder of this certificate that the corporation reserves the right to sell any part of said land free and clear of this lien, by reserving, however, five dollars per acre for each and every acre sold, as a sinking fund to pay said stock.

"For each share of preferred stock subscribed and paid for by me, I am to have, free of further charge, one share of the common stock of said corporation.

"I agree to pay the sum of $2000 for said preferred stock upon signing this application, and the balance, the sum of $3000, on or before Aug. 3, 1909. All checks payable to Mexican Gulf Land & Development Co., Ltd.
"Name—IDA B. W. BOOTH."

On the back of this she wrote: "I hereby elect to surrender the preferred stock and take land in lieu of it. Ida B. Booth."

"We hereby acknowledge receipt of the within contract and have filed the same, and agree to make warranty deed to land named to the amount of 500 acres as soon as the same is surveyed; also to issue the common stock provided for in this contract at the next meeting of the board of directors.
"James T. Burney, Pres.
"Robert Miller, Secy."

She also paid the $2000 and executed the $3000 note in question here. Under date of August 5, 1908, Scott and Burney delivered to her a writing signed

by them in which they acknowledged payment as above stated and agreed that they would take her over to the land between January 1, 1909, and August 5, 1909, and after she had seen the land and examined it if she was not satisfied to take it they would return to her the $2000 with interest and surrender the note. This paper was signed and delivered simultaneously with the signing and delivery of the application and election to take the lands. On July 18, 1910, The Mexican Gulf Land & Development Company, Limited, made its deed in the ordinary form of warranty deed in use in this State, purporting to convey to plaintiff certain lands ''in the jurisdiction of the village of Soto la Marina, State of Tamaulipas, Republic of Mexico,'' by descriptions corresponding with the subdivisions of the quadrangular survey of public lands in this State, without mentioning the area included, and reserving certain rights for public highways, canals, ditches and other necessary structures for irrigation purposes. This instrument was acknowledged before a notary public in Kansas City, Missouri, and was without other authentication. Plaintiff tenders it to defendants in her petition.

The evidence shows that the corporation sold, altogether, 39,659 acres of the 75,000 purchased from Scott, for $226,000, out of which $150,000 was paid to Doctor Scott, as the purchase price of the land. The parties in their statements filed in pursuance of our Rule 15 give us no information as to what became of the other $76,000 so received.

The company continued to do business in Kansas City for something over three years. The office of its president, secretary and treasurer were in that city and its funds were handled through the banks at that place. We find no evidence in the record that its business was not entirely directed from and transacted through those offices.

Two, at least, of the incorporators, refused to receive the certificates for the five shares of common stock assigned to them. One of these was a vice-presi-

dent of the company.  It appears from the testimony, including that of Doctor Scott, who testified in his own behalf as well as in behalf of the other defendants, that the official as well as the popular language of the Republic of Mexico is Spanish.  That while a deed written in English according to the forms in use in Missouri is sufficient in form to convey lands in that country, it is necessary, if executed in this country, that it be acknowledged by the grantor before an officer authorized to perform such duties by the laws of the State in which it is executed and the acknowledgment taken, and must bear a certificate of the official character and capacity of such officer under seal of a court in the same jurisdiction, and in turn be certified by a consular officer of the Republic of Mexico. It must be then taken or sent to the office of the  minister of foreign relations in Mexico, to be vised with a certificate of the official character of the Mexican consul in the United States, stamped in payment of a tax of two-tenths of one per cent upon the consideration, translated, and then registered or protocolized in the district in which the land is situated.  A translation is returned to the person securing the registry.

The evidence will be noticed further as necessary in the opinion.

I.  This is an action instituted by petition in the nature of a bill in equity to recover two thousand dollars in money with interest, and to secure the cancellation and surrender of a promissory note for three thousand dollars signed by plaintiff and payable to Mexican Gulf Land & Development Company, Limited, one year after August 3, 1908, the day of its date.  Both money and note were delivered to defendants in payment for five hundred acres of land in Mexico, which they, on that day, sold and promised to convey to her if she should, after seeing it, be still satisfied with her bargain.

The defendants deny any obligation or liability which may have grown out of this transaction, because,

in all things connected with it, they were acting, so far as they or any of them acted at all, as the directors and officers of an Arizona corporation named as payee of the note and not otherwise. The plaintiff, on the other hand, charges that there was no such corporation; and that if there was such a corporation in Arizona, it had no existence in this State, nor any right nor power, in that capacity, under the laws of this State, which make them partners and liable as such in all respects growing out of this transaction.

The question so raised lies at the foundation of this case. It calls for the construction of our statutes relating to foreign corporations, including the provision of Section 3039, Revised Statutes 1909, "that the Secretary of State shall not license any foreign corporations to do business in Missouri when it shall appear that such corporation was organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State, as it would be a fraud upon the laws of both states, and its pretended incorporators would be held as partners, and as such become liable for the debts of the alleged corporation." Our attention is directed by the respondents to the fact that this provision was first inserted in the section by an act of the Legislature entitled, "An Act to repeal Section 1025, Revised Statutes 1899, and to enact a new section in lieu thereof, relating to private corporations, with an emergency clause," approved March 24, 1903 (Laws 1903, p. 121), and that neither the old section so repealed nor the title to the new one which we have quoted contains any reference to the liability of incorporators as partners, and that the new section is, in that particular, void because violative of the provisions of Section 28 of Article 4 of the Constitution. This section was taken from the Constitution of 1865, so that it has been long in force, and frequently before this court for construction. It has also been held that the title of the amendment in the form adopted in this case is a sufficient compliance with this constitutional provision in so far as it relates to the subject included in

the law repealed or amended. [State ex rel. v. Ranson, 73 Mo. 78; State ex rel. v. Laughlin, 75 Mo. 358; Ferguson v. Gentry, 206 Mo. 189; In re Ferguson Estate, 206 Mo. 203; State ex rel. v. Imel, 242 Mo. 293, l. c. 303; Burge v. Railroad, 244 Mo. 76, l. c. 89; State ex rel. v. Gordon, 245 Mo. 12; See also State v. Mathews, 44 Mo. 523.] These cases cite many authorities on the same question, which may be read with interest and profit. The practice of making changes in the statutory law of the State in this manner has become so firmly imbedded in the legislative practice of the State that a judicial change would probably lead to unthought of results. It is an old and well tried doctrine that these constitutional restrictions should be construed liberally in support of the legislative power, and in State ex rel. v. Laughlin, 75 Mo. 147, we distinctly held that judicial acquiescence should be weighed in favor of the legislative judgment.

The principle underlying this class of cases is very simple. It stands upon the fact that an act in terms repealing an entire chapter, or article or section of the body of the statutory law may be valid, because its subject is the law repealed and includes the subject of that law in which its separate provisions on that subject are all included. The enactment of a law in lieu of the subdivision so repealed simply and clearly expresses the fact that the new law stands in place of the old, with new and different provisions on that same subject. This has all been plainly expressed by this court in numerous cases, and the validity of much of our statutory law hangs upon this form of enactment.

There is another principle which goes hand-in-hand with the one already stated. It was lately approved by this court in Woodward Hardware Co. v. Fisher, 269 Mo. 271, and was clearly stated through BOND, J., in State v. Sloan, 258 Mo. 1. c. 313, in the following language: "Where a title descends to particulars and specifies a certain class included within the provisions of the act, to the exclusion of others, it does not sufficiently indicate the purport of the law, and is to that extent violative of the constitutional provision."

In the Woodward Hardware Company case, supra, the constitutionality of certain provisions of an act of the General Assembly entitled, "An act to provide for annual registration, supervision, and filing of annual reports of certain corporations; suspension and forfeiture of corporate charters for violation of this act; reinstatement after suspension or forfeiture; and fixing fees for registration, prescribing fines and penalties for violation, and repealing all acts in conflict therewith, with an emergency clause," was questioned. This title descended into the most minute particulars consistent with its character as a title. It provided, among many other things, that "any person, or persons, who shall exercise, or attempt to exercise, any of the powers, privileges, or franchises of any corporation after the certificate, or license,' of same has been forfeited and cancelled as in this act provided, shall be deemed guilty of a misdemeanor, and upon conviction punished as hereinafter provided; *and the officers and directors . . . of any corporation which shall so violate the provisions of this act shall be held as partners and become severally and individually liable for the debts of such corporation.*" It was evident that the words in italics were not included among the particulars specified in the title, and we so held. The case clearly illustrates the distinction between these two classes of titles.

The title of the Act of 1903 relates to "private corporations," and to the repeal of a section of Chapter 12 of the Revised Statutes of 1899, which contained the statutory law of the State upon that subject. The section repealed relates to foreign corporations, and the terms on which they shall be permitted to do business in this State. The title to this act then calls for the enactment of a new section to take the place of the section repealed. This new section relates solely to the same subject, and among its provisions forbids the admission of foreign corporations formed by citizens of this State for the purpose of avoiding its laws. That thus far this act relates solely to the subject covered by the repealed section is too evident to admit of simpler

statement. But a law is not in fact a law unless there exists some means of enforcing it, and this act declared that the incorporators violating the law by doing business in this State in the name adopted by them as a corporate name would be held as partners and liable for debts so contracted. While this partnership provision is in the form of a legislative declaration of a familiar principle of the common law rather than of a law-making enactment, it is perfectly germane to the subject of "private corporations," and particularly to the subject of foreign corporations and their right, in this State, to clothe themselves with a mantle of protection woven from foreign laws. Applying these rules to the Act of 1903, we can see no reason to hold it inoperative in the respects mentioned on the constitutional ground upon which it is attacked.

II. It is not contended that any of these incorporators were not, at the time of the Arizona incorporation, citizens and residents of Missouri, unless the statement that Mrs. Scott, the wife of the defendant of that name, was still sojourning in Dallas, Texas, where they had formerly resided, removes him from that category. We have carefully read the testimony on that point and see nothing in it which tends to contradict the deliberate statement of all the incorporators written upon the face of the articles, that he was a citizen of the United States and a resident of this State. These facts constituted him a citizen and resident of Missouri within the meaning of the words used in that act. It follows that all the incorporators were citizens and residents of this State. This leaves us the naked question whether or not they organized the corporation under the laws of Arizona for the purpose of avoiding our laws. If so our statute forbids it to transact any business in this State, and withholds from it the certificate provided by the Legislature to give it corporate entity for that purpose.

The law presumes that one intends the necessary and obvious consequences of his act. The articles of

To Avoid Laws.

association of the Arizona corporation provide that the principal place of its business outside Arizona shall be Kansas City, Missouri, at which place meetings of the board of directors may be held and any and all business of the corporation transacted. All other offices were designated branch offices. The capital stock was to be paid into the treasury at such times as the board of directors should direct, either in cash, or by the sale and transfer to it of real or personal property, or for services rendered; the shares so issued to be fully paid and non-assessable. The amount of the capital stock was fixed at one million dollars, of which one-fourth was˜ to be preferred, bearing interest at the rate of seven per cent. per annum, the par value being payable five years from date of issue and to constitute a lien on all the property of the corporation. The only purpose for which an office or agent was required in Arizona was to provide opportunity for the service of process in that territory.

By the filing of these articles in the proper office these seven gentlemen, one of whom (Doctor Scott) seems from the evidence, including his own testimony, to have been highly sophisticated, were˙ transformed, *pro forma,* by the operation of the laws of Arizona into the Mexican Gulf Land & Development Company, Limited. While a resident of Arizona by the operation of the laws upon which it must depend for its entity, it was, nevertheless, to *live* in Missouri, from which all its vital functions were to be controlled. All subordinate agencies must look to that source for their authority, and if the board of directors should think it desirable to meet elsewhere authority to do so must eminate from and records return to that place. To do all this required the permission. of the laws of this State. It does not need argument nor the citation of authorities to show that the exercise of this supreme authority in all its activities constitutes the business of the corporation in its widest sense, and that the legislative permission could only be shown by the certificate

of the Secretary of State required by Section 3039, Revised Statutes 1909.. This forbids the issue of such certificate if these incorporators went to Arizona to *avoid* the laws of this State. We italicize the word avoid, because it has sometimes been judicially read "evade." The Legislature, in the exercise of its police power, has shown great discrimination in its choice between these two words. We find, by reference to the dictionary, that "avoid" has no sinister meaning. It does not imply subterfuge or artifice in escape. It is one thing to avoid the commission of a wrong, and yet another to evade its punishment.

This corporation was formed for the purpose of carrying out the contract of March 30, 1908, between Doctor Scott and his associates. That contract involved the formation of a corporation, *in Arizona,* without the payment of a dollar upon its capital stock. Its authorized capital was to be one million dollars. Its purpose was to be the purchase of a tract of land in Mexico from Doctor Scott (who owned it) as a corporation for $150,000. This money was to be raised by the sale of preferred stock. Two-thirds of the common stock, or one-half the entire authorized capitalization, was to be taken, without any payment whatever, by the incorporators, while the other one-third was to be given as a bonus to such persons as could be induced to purchase the preferred stock at par. Reduced to its lowest lingual terms this means that the paid-up capital of the company at the time of its organization was nothing, and that the contemplated capital was to consist of the proceeds of the sale to the public of $250,000 par value of preferred stock.

That they could not incorporate upon that basis under the laws of their own State is evident. Two of these incorporators knew it, because they were excellent lawyers. One of them who was not a lawyer frankly stated in his evidence that he knew it, and the others, including Doctor Scott, are presumed to have known it. It was necessary that they should incorporate *some-*

Booth v. Scott.

*where* to enable them to issue securities which they must sell, and the contract named Arizona as the complaisant keeper who would turn them loose armed and equipped for a stock-selling drive in their home State.

It is suggested that the law forbidding such corporations access to the State of Missouri is, in that respect, a penal enactment, and should therefore be strictly construed against the public and liberally in favor of the corporation seeking admission. We do not concur in this view. That it is within the scope of the police powers of the State is not seriously denied. That it is salutary in its nature and well calculated to protect the people of the State from imposition is evident. It is suggested that the laws of this State thus protected from avoidance by its citizens and residents are those relating to the business which the tramp corporation is to conduct within the State, and not those pertaining to its organization, its credit, or the nature of its securities. We cannot agree to this because it is not so written. At the time this act was passed this field was already covered by the provision of Section 3037 that the foreign corporation "shall be subjected to all the liabilities, restrictions and duties which are or may be imposed upon corporations of like character organized under the general laws of this State, *and shall have no other or greater powers."* They could not therefore avoid the laws of this State by extending their activities to other fields than those allotted to domestic corporations. The only laws that could be thus avoided would be those limiting the right to become corporations of this State, and that is the very subject of which the amendment purports to treat. We had already provided for the protection of our citizens against imposition in the purchase of the securities of our own corporations by affording the statutory assurance that the value of their stocks is protected by the payment of at least one-half in cash or its honest value, while the remainder, if any, consists of bona-fide

obligations of individuals. There was every reason that this protection should extend to securities offered by foreign corporations and this statute was a just, reasonable and necessary recognition and performance of that duty. There is no reason why the sojourner within our State should not be subjected to the same moral restrictions as ourselves.

It may be said that sufficient protection was already afforded by that provision of the section we are considering, requiring the license certificate as a condition of the right to transact any business in this State. Whether this be true or not is a legislative question. The Secretary of State is an administrative officer acting in such matters by virtue of his statutory powers. It is for the Legislature to prescribe under the Constitution the manner in which those powers shall be executed. This is illustrated in the decision of this court in State ex rel. v. Cook, 181 Mo. 596, which came before us in an original proceeding instituted immediately after the enactment of the amendment of 1903. The Brown Contracting & Building Company, the relator, had been organized and incorporated in New Jersey by two residents of this State and one resident of New Jersey, and applied to the Secretary of State for its license certificate to do business in this State. It was refused on the ground that two of its incorporators were citizens and residents of Missouri, and mandamus was instituted in this court to compel its issue. It was admitted that its capitalization of $5000 had been fully paid at the time of its incorporation and that the business for which it was organized and which is indicated by its name was such as might be lawfully prosecuted by corporations formed under the laws of Missouri. The sole question involved was whether the fact that two of the three incorporators and directors were citizens and residents of Missouri raised the legal presumption that it was incorporated in New Jersey for the purpose of avoiding the laws of this State. In holding that it did not, we said:

"The Attorney-General in his brief in behalf of the Secretary of State cites the decision of the Kansas City Court of Appeals in Cleaton v. Emery, 49 Mo. App. 345, but an examination of that case will show that Judge GILL's opinion was not based upon the fact that citizens of Missouri incorporated under the laws of Colorado, but upon the fact that the corporation was not formed in compliance with the laws of Colorado, and for the further reason that the actual subscription of stock amounted to forty-three thousand dollars, whereas the capital stock was fixed at one million dollars, and the articles of incorporation did not provide for the location of its general or principal office within the limits of Colorado. The Court of Appeals held that the incorporation was a fraud upon the State of Colorado, and that it was clearly in contravention of our laws to permit the said company to provide for a capital stock of one million dollars and subscribe less than $50,000, and therefore our courts would not recognize it as a valid corporation, saying that 'the sole purpose was to avoid the restrictions so wisely engrafted onto our corporation law. To hedge about and protect its people from false appearances and merely advertised capital that has no real existence, our Legislature has provided against the creation of those *corporations of abundant pretenses and no capital.*' To the same effect is Davidson v. Hobson, 59 Mo. App. 130. In this case it is admitted that all of the capital stock is not only subscribed, but fully paid up, and it is not questioned that the laws of New Jersey have been complied with.'' [181 Mo. l. c. 610.]

In this case as we have already pointed out, although the capitalization of the Mexican Gulf Land & Development Company, Limited, was fixed at one million dollars, not a dollar had been either subscribed or paid, and it was admitted that the corporation was formed for the purpose of carrying out a contract by which 5000 of the 7500 shares of common stock was to be issued without any compensation whatever to the incorporators, who were the original defendants in this case, and that the

remaining 2500 of these shares were to be issued without any consideration therefor as a bonus to those who should purchase the so-called preferred stock at par. All these certificates were, by the terms of the charter, as well as of the contract, to contain and did contain upon their face the false statement that they were fully paid.

We used the word "so-called" in connection with the preferred stock which, by the scheme of incorporation, was to gather from the public, who had no means of ascertaining the existence or terms of the contract, the entire capital of the investment. These words call for an explanation. The articles of association provided that the seven per cent interest which these certificates bore was to be paid from the net earnings of the company. This was consistent with its character as capitalization, as it provided only for a preference as to dividends. The certificates issued, including the one purchased by plaintiff, left it out, and in addition to the statement that it should be a lien on all assets of the corporation, they contained a promise to pay interest at the rate of seven per cent per annum absolutely; and defendants admitted in their testimony that in selling it, they represented to the purchasers that is constituted a mortgage upon all the assets. That this form of certificate destroyed its character as preferred stock is evident. [Winscott v. Investment Co., 63 Mo. App. 367.]

We think that the question whether or not this corporation was formed for the purpose of avoiding the laws of Missouri with reference to the capitalization and organization of domestic corporation is, as was expressly determined in the Cook case, supra, a question of law upon the facts stated and admitted in the record; and that under those facts it acquired no right to transact business as such corporation in this State, nor to the certificate authorizing it to do so. As it never comtemplated, asked for nor received such certificate, these facts are only pertinent in considering the personal liability of the incorporators in this transaction.

III.  It is not contended that the State has not the plenary power to exclude a foreign corporation from doing business within its borders.  Nor can its motive for such exclusion be called in question.  State statutes for this purpose do not come within the provision of the Fourteenth Amendment to the Federal Constitution forbidding the State to deny to any person the equal protection of the laws.  [Hammond Packing Co. v. Arkansas, 212 U. S. 325.]  The reason for this is simple.  These intangible entities exist by operation of the law which creates them, and although the comity of states may recognize their existence, that comity is only co-extensive with the policy of the state, which may create and regulate by its own laws such artificial agencies as its people need.  Otherwise, the laws of a foreign state would be paramount to our own.

*Exclusion from State.*

It has for a long time been, and is, the policy of this State to protect its people from the lure of corporate adventurers who, without capital, speak in terms of millions, and who use the imprint of the dollar-mark as a false representation of material wealth.  In the Arkansas case, supra, the Supreme Court of the United States held that the corporation could be excluded because it had done, at its home in Illinois, acts contrary to the policy of the laws of Arkansas and prohibited by statute of that State.

That all contract made or attempted to be made in this State by foreign corporations not licensed to do business in this State as required by the provisions of Section 3039, Revised Statutes 1909, are absolutely void, has been too often decided by this court to be still an open question.  [Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404; Mill & Lumber Co. v. Sims, 197 Mo. 507; Roeder v. Robertson, 202 Mo. 522; United Shoe Machinery Co. v. Ramlose, 210 Mo. 631; Zinc and Lead Co. v. Zinc Mining Co., 221 Mo. 7; United Shoe Machinery Co. v. Ramlose, 231 Mo. 508; Cement Co. v. Gas. Co., 255 Mo. 1.]  In the Roeder case (l. c. 536) this court stated the rule as follows: "If

*Void Contracts.*

such corporations, in violation of this act, do business in this State, all such transactions are, by the courts, declared null and void, and all contracts made by them with citizens of this State for the sale of goods, wares and merchandise are nullities, and the title to the property sought to be transferred thereby does not pass to and vest in the vendee, but remains in the vendor, the same as if the pretended contract had not been executed." The same language was quoted with approval in each of the two cases last cited. It clearly states the foundation on which our policy rests.

IV. When our own citizens invoke the aid of our laws to be relieved from personal responsibility in their business transactions, they are required not only to contribute a fund to take the place of their personal credit, but also to make a permanent and accessible record of that fact to which those dealing with them may readily refer. Until they have done this, they must, in whatever name they may choose to contract, respond from their own resources. Section 3039 of our Revised Statutes contemplates and requires that when they go to a foreign state for a corporate name and corporate protection from personal liability, they shall, upon their return to enjoy that protection, comply with our laws. They cannot bring with them the laws of a foreign state, and thereby avoid the operation of our own. Their right to make any contract or transact any business in a corporate capacity depends, as we have seen, upon the license of the Secretary of State which constitutes them a corporation of this State, and the authority to issue it is withheld in express terms by the amendment of 1903.

*Lessened Liability.*

That this provision of the act is valid does not seem to be questioned, but the amendment proceeds to state, in substance, that this attempt to avoid the laws of their own state is a fraud, and does not protect them from their own acts done in the corporate name.

V. The "pretended incorporators," as the statute calls them, contend that persons dealing with them in

their corporate name do so at their peril. This raises

Fraud. the question of their personal liability under the amendment of 1903, ignoring that provision of the act which expressly recognizes it, and, for the present purpose we will also ignore it. The same act denounces the incorporation as a fraud upon this State. This seems to us to be a logical and natural as well as a legislative declaration of the law applicable to these facts. When the "pretended incorporators" established the principal office of their Arizona corporation in this State and proceeded with the transaction of its general business from that office and invited the people to transact business with them in a corporate capacity therein, they represented to those who accepted the invitation that they had done every act required by our law to give them that capacity. They represented that their capitalization had already been subscribed and paid to the extent required by the laws of Missouri, and that they had received the license to which that fact would have entitled them. In so far as these representations were untrue they were fraudulent, and the invitation was a fraud upon the laws of the State. Their continuance for about three years in this unlawful course and the collection of $226,000 from the people on account of the business so transacted, give them no immunity from liability. If it be said that it was the duty of all who dealt with them to ascertain the facts, one answer is that by the terms of Section 3040 it was made the duty of the Secretary of State to extend over all the people this measure of protection, and of the prosecuting attorney of Jackson County to go to his assistance if called upon. Another reason is founded upon the same principle that withholds from the prowler the right to dictate the character of the locks with which his neighbors shall secure their doors. In that case, as in this, immunity is assured by obedience to the law and liability is incurred by its violation. It needs no elaboration to demonstrate that this corporation was doing business in this State. It came without a dollar and not a single share of its capital stock had been subscribed or issued.

The respondents contend, in their brief, that its entire business consisted in the sale of its capital stock. If this be true then the sale of the stock was its business, and not a mere incident of a lawful business, as in the case of Bank v. Leeper, 121 Mo. App. 688. But as we have already said the paper which they sold was not capital stock, but notes bearing seven per cent interest, payable regardless of earnings, and constituting liens upon all the assets of the corporation. These were aptly described by the defendants as mortgages upon their property. This was the theory upon which they were sold to the public, including this plaintiff. Apparently fearful that this theory may not be tenable, they present an alternative to the effect that their business consisted not in the sale of stock, but in the sale of lands in Mexico, and in the development of such lands in that Republic. In this connection it is well to notice the very transaction in which this plaintiff was involved and which seems to be a fair sample of all sales of stock and lands, a certificate of stock or mortgage, whichever may be the more appropriate name, was issued to the plaintiff, convertible at her option into land. At the same time there was written upon the same paper and signed by her an option to take land. Two years afterward an instrument purporting to be a deed to land in Mexico was given her. It is also shown that some land was cleared and cultivated in Mexico and that water concessions for purposes of irrigation were obtained from the Mexican authorities, and that steamboat excursions from Texas ports to Victora in the Mexican State of Tamaulipas, in which the land was situated, were run, but the expense of these enterprises are not stated. All of them were, however, paid for from the funds in the hands of the treasurer at Kansas City, Missouri. It is unnecessary to demonstrate more particularly that these things constituted the transaction of business in this State, and we so hold.

VI. We have already in paragraph two, supra, pointed out that it has been long settled in this court that

VOL. 276,

Booth v. Scott.

every *business transaction* and contract made in this State by a foreign corporation which has not Transactions Void. been admitted to do business in this State is absolutely void. This declaration stands upon the foundation that there is no corporation in this State until it has complied with the conditions of our statute which confers the corporate capacity within the limits of our governmental jurisdiction. There being no corporation, the persons assuming to transact business in this State in the corporate name are partners with respect to personal liability. [Hurt v. Salisbury, 55 Mo. 310; Richardson v. Pitts, 71 Mo. 128; Martin v. Fewell, 79 Mo. l. c. 411; Hyatt v. Van Riper, 105 Mo. App. 664; Glenn v. Bergmann, 20 Mo. App. 343; Davidson v. Hobson, 59 Mo. App. 130.] In Martin v. Fewell, supra, it was said by this court that the defendants "not being a corporation, their liability cannot be a corporate liability, but must be that of a joint stock company." Under the logic of the opinion in Richardson v. Pitts, supra, "the defendants are liable as partners directly to the plaintiffs." In both the Richardson and Martin cases it was held that the liability attached equally to all the members of the defective corporation as well as to the officers and agents transacting the business.

This record shows that the Arizona corporation had, before the bringing of this suit, disappeared from the State of Missouri. While, as a matter of law, it never existed here, it had as a matter of fact a business office in which it was not permitted by our laws to transact business, occupied by persons holding themselves out as its official representatives, but who in fact had no power to represent it. They could and did in all their transactions represent only themselves and their associates. While it is clear that in all their transactions in the name of the corporation they bound themselves and their associates these transactions were absolutely void as to the corporation.

The application of this principle is complicated by the fact that although the alleged liability of the defendants grows out of contracts and transactions unlawfully

made in this State in the name of the corporation, and entirely between citizens of this State, there has been a partial performance, and the applicant is seeking to be re-instated to the condition she occupied before these acts were done. She paid money to the defendants through their office in Kansas City, executed the note which she now seeks to have cancelled at the same place and received there an instrument of writing purporting to convey lands in Mexico, the purchase of which was the ultimate object of the transaction. In doing these things the defendants occupied the same position with relation to her rights as would the corporation at its home in Arizona. So far as the transaction with the appellant lies in contract, they are bound to respond. So far as it consists in the duty to make restitution by reason of the illegality of the transaction, they must also stand in its place. Considered from this standpoint upon principles which have become firmly settled by our own adjudications the whole question becomes simple.

*Restoring Status Quo Ante.*

The Roeder case, supra, was brought by the assignee of a foreign corporation which had never been licensed to transact business in this State, to recover the full value of a threshing machine and outfit sold by the corporation to the defendant, for which an old threshing machine and defendant's notes were given. The machine had been demanded and the demand refused. No tender had been made of the old machine, which had been sold by the corporation. This court held that while the entire transaction constituting the sale of the machine to defendant was void because the corporation was not licensed to do business in this State as required by the statutes, it was the duty of the plaintiff assignee, before he could recover the machine or its value, to make the defendant whole by returning to him the old machine, his title to which had not been extinguished by the transaction. The court held that the entire transaction was void, and that no title had passed

from or to either party for any property included in it. This was simply giving full effect to the language of the statute forbidding one of the parties to transact business in this State. It was powerless here to buy or sell, and could not do by indirection that which it was disqualified to do by direct and formal contract.

United Shoe Machinery Company v. Ramlose, supra, was replevin for a machine sold by the plaintiff, a foreign corporation, to the defendant in this State. The machine had been taken upon mesne process by the plaintiff. The judgment was for the return of the machine or, in default thereof, against the plaintiff and his sureties for its assessed value. Court in Banc held that the plaintiff had not parted with his title or right of possession of the machine by the sale, and was entitled to recover. It is worthy of note that GRAVES, J., dissented on the ground that the judgment made it possible for the foreign corporation to use the action of replevin as a subterfuge to give effect to a sale in this State which would otherwise be void by force of the statute we are considering.

In Cement v. Gas Co., supra, the plaintiff, a foreign corporation unqualified under our statute to transact business in this State, was permitted to recover the amount of a deposit made in this State in connection with a contract with another foreign corporation for purchase and sale of a pipe line in Oklahoma. Neither party to the transaction was licensed to do business in Missouri.

These cases clearly demonstrate the effect of the transaction now before us. No title either to money or property passed to or from either party. Nor was any obligation in favor of the Arizona corporation created by the plaintiff's note. The delivery by plaintiff of her money and notes carried with it no title, and the courts of her State are, under the doctrine of these cases, open to her to reclaim them to at least the same extent as to a delinquent foreign corporation which had parted

with them in violation of the law, as was done in each of the three cases last cited.

On her part she received a general warranty deed in the form in use in this State, acknowledged before a notary public of Jackson County, Missouri, and without further or other attestation, and written in the English language. This conveyance is tendered back in thé pleadings and brought into court for that purpose. It deserves notice. We take judicial cognizance of the historical fact that Mexico was a Spanish colony for about three hundred years before it became an independent republic, that its official language is Spanish, and that its unwritten law, like that of other Latin peoples, springs from the Justinian Code. No part of its statute law is in evidence in this case. Whatever may be the case as to countries and states whose laws are founded, like our own, in the English common law, where the English language is the language of the people, there is no presumption that the laws of Mexico with reference to the alienation or transfer of lands are similar to our own. "It is a principle firmly established that to the laws of the state in which the land is situated we must look for the rule which governs its descent, alienation and transfer." [De Vaughn v. Hutchinson, 165 U. S. 566; Olmstead v. Olmstead, 216 U. S. 386; Richardson v. De Giverville, 107 Mo. 422.] It cannot be conceived that the laws of one independent state can in any way interfere with the disposition of any part of the domain of another. This principle, with a copious citation of authorities, is clearly expressed in 5 R. C. L. 925, as follows. "All real or immovable property is exclusively subject to the laws of the country within which it is situated, and no interference with it by any other sovereignty can be permitted. It therefore follows that all matters concerning the title and disposition of real property are determined by what is known as the *lex loci rei sitae,* which can alone prescribe the mode by which a title to it can pass from one person to another."

Was the deed given to the plaintiff in this case, such a document as would be available to her in Mexico? There was much testimony introduced as to its force and effect as a conveyance in the condition in which she received it, but after a careful reading of it all we cannot conclude that it even tends to show its sufficiency for that purpose. Perhaps the most definite statement was from Doctor Scott himself, for whose benefit the corporation seems principally to have been organized. He testified, in substance, that he was well acquainted in that country and had some experience in handling its lands. That to prepare a deed for "protocolization" it might originally be made in the English language according to the form used in Missouri, and acknowledged before a notary public in this State. The official character of the acknowledging officer must then be certified on it by the clerk of a court under seal of his court, and the official character of the clerk certified by the consul of the Republic of Mexico in that jurisdiction. It must then be taken or sent to the Federal Minister of Foreign Relations in the City of Mexico, who would certify to the official capacity of the consular officer. This would end the functions of the Federal government in the matter, and it could be taken to the proper officer of the state in which the land was situated to be protocolized in the proper local jurisdiction. There the tax was to be paid by stamps affixed, which in this case would amount to about $10. It was then translated into the Spanish language at the expense of the party presenting it, and the original affixed to and preserved in a protocol of titles affecting that particular land, and a Spanish copy delivered to the party presenting it. There was no evidence whatever that a deed could become effective as a legal transfer of the title until all this was done. The only evidence upon that point being the general statement of some witnesses that a deed in the Missouri form was effective, which is undoubtedly true so far as its form goes. There was evidence that the stamp tax was paid accord-

ing to the agreement of the parties, but no evidence that plaintiff had made any agreement to pay it in this case or that her attention was directed to its necessity. As to the payment of the cost of translation nothing was said. Doctor Scott also said that the entire capital stock of the corporation was delivered to him as security instead of the preferred stock alone, as had been first agreed, because General Garza y Ala, a very good lawyer of Monterey whom he consulted, advised him that the legality of a corporation in Mexico depended upon the payment in full of the capital stock. The deed under which this land was held by the corporation was not for some reason used or produced at the trial. Were it in the record it might go far to clarify the situation. It seems from the meager testimony before us that these transactions were closed with the least possible expense to the incorporators and without reference to the contract rights of the purchasers. This impression is strengthened by the historical fact that at the date of this deed, on July 18, 1910, the revolution was seething in Mexico. Madero was in prison at the capital and Diaz and Corral nearing their end. We feel free to mention this because the defendants have assigned the "revolution" as the cause of their undoing. Doctor Scott seems to have been mindful of it from the beginning. We do not think that receiving this deed, close upon the heels of the departure of the Arizona corporation from the State, had the effect of strengthening the contract with plaintiff as made by her subscription to the preferred stock, her election to take land instead, the payment of her money and the execution of her note. We do think there is no difficulty in placing all the parties on the same footing upon which they stood before the beginning of this transaction. The repayment of the money and the surrender of the notes and deed will do this. It will not only work substantial justice between the parties, but will give some effect to our statute, which was, as we have seen, enacted for the sole purpose of

correcting the very abuse which is responsible for this controversy.

VII. We have already disposed of the contention that the action is barred by the limitation of three years prescribed in Section 1890, Revised Statutes 1909, in actions upon statutes for a penalty or forfeiture, by holding that this is not such an action. The **Limitations.** petition states with technical accuracy the facts constituting the cause of action, and is sufficient. In view of the conclusion at which we have arrived, it is not necessary to notice the various objections of plaintiff to the several answers of the defendants.

Equitable relief was asked by the petition and the cause was tried by the court without a jury. We have, therefore, in reaching our conclusion, considered the evidence without reference to the findings of the court, so that it is unnecessary to decide whether the same result would necessarily follow from the facts found.

The judgment of the circuit court for Jackson County is reversed, and the cause remanded to be proceeded with to final judgment in accordance with our views as herein expressed. *Railey, C.,* not sitting.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the Court. All of the judges concur; *Blair* and *Graves, JJ.,* in a separate opinion by *Blair, J.; Bond, P. J.,* in paragraphs 3 and 7 and result.

BLAIR, J. (concurring).—In that portion of the opinion which holds that the "form of the certificate destroyed its character as preferred stock," I do not concur. The agreement evidenced by the certificate copied in the opinion includes "an implied condition that the payment shall be made only out of net profits which are legally applicable to the payment of dividends. This is true whether the agreed payments be called 'dividends' or 'interest,' and whether they be

guaranteed or simply promised.'' [Feld v. Roanoke Investment Co., 123 Mo. l. c. 620.]

. In the remainder of the opinion and the result, I concur. GRAVES, J., concurs in this.