## FRANK MEIR v. WALLACE CROSSLEY et al., Appellants.

Division One, August 27, 1924.

1. **FOREIGN CORPORATION: Doing Business in this State.** A corporation organized in Delaware for the purpose of leasing and buying lands in Kansas and digging and operating oil wells upon them, is not doing business in this State, when it maintains a general office, holds directors' meetings, makes contracts relating to the sale of notes, employs agents to sell its stock, who issue a prospectus describing the property and sell stock upon the faith

Meir v. Crossley.

of its false representations, and issues stock to purchasers and receives their money in payment, and does only those things in this State.

2. ———: ———: **Fraud of Agents: Liability of Directors as Partners.** Three citizens of Delaware organized a corporation in that State to buy and lease lands anywhere and dig and operate oil wells. The articles stated the capital stock would be $1,500,000, divided into 1,500,000 shares of the par value of one dollar each, and that the company would begin business with one thousand dollars. The three subscribed for one thousand shares, and so far as the evidence discloses the company was a *de jure* corporation of Delaware. They transferred their shares to the five defendants, citizens of Missouri, and elected them directors. The purpose of defendants was to use said corporation to buy or lease oil lands in Kansas, and produce oil from them, and they negotiated with a party who had leases or a contract of purchase for the sale of said lands or leases to the company. By contract the company gave to a broker exclusive right to market the stock on a commission basis of twenty per cent. To induce the public to buy the stock he prepared, printed and circulated a prospectus which contained statements concerning the assets of the company which were both extravagant and false, and plaintiff, being misled thereby, invested fifteen thousand dollars in the stock, which he eventually lost. The defendants, directors of the corporation, did not actually participate in the fraud, nor did they have knowledge thereof, nor does the evidence connect them therewith, directly or indirectly. Plaintiff seeks to fasten liability upon them as partners, on the theory that the corporation was fraudulent under the statute (Sec. 9792, R. S. 1919) which declares that a corporation "organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State . . . would be a fraud upon the laws of both states, and its pretended incorporators would be held as partners." *Held*, that the plaintiff cannot recover from the defendants on the theory that said statute makes them liable as partners, because, *first*, his own evidence affirmatively shows that they had nothing to do with organizing the corporation or causing it to be organized, but they became stockholders and directors after its charter was obtained; and, *second*, there was no substantial evidence that the company was organized under the laws of Delaware "for the purpose of avoiding the laws of this State." *Held*, also, that the corporation's stocksales agents, who made the false representations, and the corporation itself, are doubtless liable for the loss sustained by plaintiff, but they are not made parties.

3. **FRAUDULENT CORPORATION**: Disguise and Fiction: Liability of Tortfeasors. Regardless of the statute (Sec. 9792, R. S. 1919) the law does not permit a fraud-feasor to hide behind a corporate form, but where a corporation is formed, for the purpose of accomplishing a fraud or other illegal act under the guise of the fiction that it is a legal entity, separate and distinct from its incorporators, the fiction will be disregarded, and they dealt with as though no corporation had been formed. But that law does not entitle the purchaser of stock of a corporation, induced to buy by the fraudulent representations of its agents, to recover his loss from its directors, on the theory that the directors are partners, where there is no substantial evidence that the corporation was organized or promoted for a fraudulent purpose, and none at all that they or any of them, when they bought its stock and became directors, knew of any fraudulent purpose on the part of its original promoters, if any existed, or that they entertained any such purpose themselves.

Headnotes 1 to 3: Corporations: 1, 14a C. J. secs. 3979, 3988; 2, 14 C. J. secs. 864, 888, and 14a C. J. secs. 3932; 3, 14 C. J. sec. 22.

Appeal from Mississippi Circuit Court.—*Hon. Frank Kelly,* Judge.

REVERSED AND REMANDED (with directions).

*Cyrus Crane, W. C. Russell* and *J. G. L. Harvey* for appellants.

(1) The petition does not state a cause of action, because the sale of stock, the maintenance of a general office, the holding of board meetings, the making of contracts and the sale of notes, all in this State, do not constitute a doing of business in this State, as that term is used in Sec. 9792, R. S. 1919, upon which said section plaintiff's petition is bottomed. 12 R. C. L., sec. 48, p. 69; Booth v. Scott, 276 Mo. 1; Bank v. Leeper, 121 Mo. App. 688; Parker v. Wear, 230 S. W. 75; Wolfing v. Cork Co., 250 Mo. 723; Hogan v. St. Louis, 176 Mo. 149; Shields v. Chapman, 240 S. W. 505; Missouri Coal & Mining Co. v. Ladd, 160 Mo. 441; Clark v. Petroleum Co., 144 Mo. App. 182; Home Lbr. Co. v. Hopkins, 10 A. L. R. 885; Ryan v. Miller, 236 Mo. 496. (2) The evidence does not show that the defendants, or any one of them,

had anything to do with the organization of the corporation under the laws of Delaware.  (3)  Even though it be held that the defendants did organize said corporation, there is nothing in the evidence to show that they organized it under the laws of Delaware for the purpose of avoiding the laws of Missouri.  State ex rel. v. Cook, 181 Mo. 602; Booth v. Scott, 276 Mo. 27; State ex rel. v. Sullivan, 282 Mo. 261.  (4)  The evidence does not show that the defendants had any connection with or knowledge of the preparation and distribution of the prospectuses, Exhibits "A" and "B."  (5)  If the corporation be held to have been validly organized, then the directors cannot be held responsible for any fraud committed by the corporation through its agents, unless such directors actually participated in the commission of the fraud.  As the alleged misrepresentations relate only to the property held by the corporation, actual participation in such misrepresentations by the directors could only be shown under the Statute of Frauds by a writing signed by such directors.  The respondent produced no such written testimony, and the court erred in admitting parol evidence of the alleged misrepresentations.  Sec. 2172, R. S. 1919; 14-a C. J. 184; Clark v. Edgar, 84 Mo. 106; Knight v. Rawlings, 205 Mo. 412; McKee v. Rudd, 222 Mo. 351, 369; Liggett v. Bank, 233 Mo. 605.  (6)  If said Section 9792 be accorded the meaning contended for by respondent, then such section is in violation of Sections 1 and 2, Article IV, of the Constitution of the United States.  Adams v. Turner, 244 U. S. 594; Allgeyer v. Louisana, 165 U. S. 589; N. Y. Life Ins. Co. v. Dodge, 246 U. S. 375; N. Y. Life Ins. Co. v. Head, 234 U. S. 149.

*Gallivan & Finch* and *Ward & Reeves* for respondent.

(1)  The acts of the oil company constituted a "doing of business" in this State as that term is used in Sec. 9792, R. S. 1919.  Booth v. Scott, 267 Mo. 1; U. S. Machinery Co. v. Ramlose, 210 Mo. 631;  Tri-State Amusement Co. v. Amusement Co., 192 Mo. 409; Chicago

Mill & Lbr. Co. v. Sims, 101 Mo. App. 569; Jones v. Martin, 15 Ala. App. 675; Donaldson v. Thousand Springs Power Co., 29 Ida. 735. (2) The exercise of any of the charter powers of a corporation constitutes a "doing of business." Bank v. Leeper, 121 Mo. App. 688; Wulfing v. Cork Co., 250 Mo. 723; Mo. Coal & Mining Co. v. Ladd, 160 Mo. 441; Hurst Automatic Switch Co. v. Trust Co., 216 S. W. 954. (3) There was ample evidence to show that defendants' attempted incorporation under the laws of Delaware was a fraud upon the States of Missouri and Delaware. Cleaton v. Emery, 49 Mo. App. 345; Davidson v. Hobson, 59 Mo. App. 130; The Journal Co. v. Nelson, 133 Mo. App. 482; State ex rel. v. Cook, 181 Mo. 596; Booth v. Scott, 276 Mo. 1. (4) Since the defendants, in attempting to organize the corporation under the laws of Delaware, did not comply with the laws of that State, then the rule of comity stressed in appellants' brief has no application. Cleaton v. Emery, 49 Mo. App. 345. (5) (a) The laws of Delaware required the incorporators to be residents of that State, and to subscribe $1000 in stock. (b) Since the persons for whose benefit the subscriptions were made by the pretended incorporators were all residents of Missouri, they, rather than the dummies, will be treated as the real incorporators. American Alkali Co. v. Kurtz, 134 Fed. 663; Pauley v. State Loan & Trust Co., 165 U. S. 606; Dum v. Howe, 107 Fed. 849; Houghton v. Hubbell, 91 Fed. 453; White v. Marquardt & Sons, 105 Iowa, 145; 14 C. J. 1032. (6) It therefore follows that the defendants should "be held as partners, and as such become liable for the debts of the alleged corporation." Sec. 9792, R. S. 1919; Booth v. Scott, 276 Mo. 1. (7) Section 9792 is a remedial statute and as such should be liberally construed so as to give effect to the legislative intent. Rogers v. Stag, 185 Mo. App. 659; Sullivan v. Sullivan Mfg. Co., 14 S. C. 499; Flenniken v. Marshall, 28 L. R. A. 402; Rider v. Fritchey, 49 Ohio St. 285, 15 L. R. A. 513; Kelly v. Fourth of July Mining Co., 21 Mont. 291, 42 L. R. A. 621.

WOODSON, J.—The plaintiff instituted this suit in the Circuit Court of Mississippi County against the defendants, to recover the sum of $15,000, the purchase price of 15,000 shares of stock in the Missouri Mid-West Oil Company (hereinafter to be designated as the ''Company'') alleged to have been fraudulently sold and delivered to him under false and fraudulent pretenses made to him by the defendants regarding the incorporation of the company and its capital stock, assets and property at the time he purchased the stock.

The trial was had before the court and a jury, which resulted in a verdict and judgment for plaintiff for the full amount sued for, and after moving unsuccessfully for a new trial, the defendants duly .appealed the cause to this court.

While the record is quite voluminous, the case as presented here in its final analysis is reduced to a comparatively small compass.

Counsel for defendants contend that the petition does not state facts sufficient to constitute a cause of action against them.   The petition in substance charges that:

Plaintiff is a resident of Scott County, Missouri; the defendant Wallace Crossley, is a resident of Johnson County, Missouri; the defendant Edwin P. Deal is a resident of Mississippi County, Missouri; the defendants C. A. Burney and Lee Wilson are residents of Jackson County, Missouri, and the defendant Roscoe Gooding is a resident of Macon County, Missouri.

For cause of action, plaintiff says that the defendants in the year of 1917, all being residents of the State of Missouri, confederated together for the purpose of organizing a corporation for the ostensible purpose of obtaining oil properties in the State of Kansas, to sell and offer for sale stock in such company to the citizens of the State of Missouri and elsewhere, and that in furtherance of such scheme and plan the defendants, in order to evade the laws of the State of Missouri, which require the incorporators to pay at least fifty per cent of the amount of the

capital stock at the time of the incorporation in cash, secured the services of three citizens of the State of Delaware as dummies for the purpose of organizing a corporation under the name of the Mid-West Oil Company of Delaware; that said dummies so selected were James Satterfield, L. B. Phillips and James Bailey, all residents of the city of Dover, State of Delaware, who, at the instance of these defendants, prepared and filed articles of association in the office of the Secretary of State of the State of Delaware on the 29th day of October, 1917, for the incorporation, with a capital stock of $1,500,000, divided in 1,500,000 shares, with a par value of one dollar each, and that said articles of association provided that the corporation would commence business with $1,000; that the articles of association recited that James H. Satterfield had subscribed for 334 shares, L. B. Phillips 333 shares, and James M. Bailey, 333 shares; plaintiff alleges that the subscriptions so made were made at the instance and for and on behalf of these defendants, and that no sum whatever was actually paid by any of said subscribers for said stock, and that immediately thereafter, to-wit, on the same day the articles of association were filed in the office of the Secretary of State of the State of Delaware, and within one hour thereafter, the said Satterfield, Phillips and Bailey held a meeting as the incorporators of said pretended corporation and transferred the subscription of James M. Satterfield for 334 shares of said stock to Wallace Crossley, defendant herein, and transferred the subscription of L. B. Phillips for 333 shares to Lee Wilson, defendant herein, and transferred the subscription of J. F. Bailey, for 333 shares to C. A. Burney, defendant herein; that at said meeting the said dummy incorporators nominated as directors of said pretended corporation for the ensuing year the defendants Wallace Crossley, Edwin P. Deal, C. A. Burney, Lee W. Wilson and Roscoe E. Gooding.

Plaintiff avers that thereafter by a resolution passed by the defendants, as directors of said pretended corporation, the name thereof was changed to the Missouri Mid-West Oil Company and copies of such resolution were filed with the Secretary of State of Delaware. Plaintiff further avers that the said pretended Delaware corporation had no property or assets in the State of Delaware, had no property or business in the State of Missouri, other than the business of the selling of stock to the citizens of Missouri; *but did and performed business in the State of Missouri, to-wit, sold a large part of its capital stock in the State of Missouri, and kept and maintained its general office, and had all of its board of directors meetings, and made contracts, and sold notes in said State* (Italics show amendment at close of testimony); that the only property acquired or intended to be acquired was contracts for or leases of lands in the State of Kansas, and that the action of the defendants in attempting to incorporate the company under the laws of the State of Delaware was for the purpose of evading the laws of the State of Missouri and the laws of the State of Kansas.

Plaintiff avers that after the attempted incorporation of said pretended oil company, the defendants, as officers and directors of said company, by means of a prospectus, literature, agents and salesmen, made false statements to this plaintiff with respect to said company and its properties, for the purpose of cheating and defrauding this plaintiff, by inducing this plaintiff and others to buy stock in said company; and plaintiff avers that the defendants conspiring and confederating together for the purpose of inducing this plaintiff to purchase stock in said company, caused to be issued a pamphlet or prospectus, dated February 20, 1918, at Kansas City, Missouri, reciting that the said company was being managed by Wallace Crossley, Edwin P. Deal, C. A. Burney, Lee W. Wilson, Roscoe E. Gooding and John T. Barker.

Plaintiff further avers and charges that after having featured in said prospectus their own official position,

high standing and character, the defendants proceeded to and did, by means of statements in said prospectus and by their own acts, statements and conduct, and by the statements of their agents and employees, by them sent out, to sell said stock, falsely and fraudulently and with the intent of cheating and defrauding this plaintiff and other citizens of this State, make the following false statements and representations, to-wit: That the said company owned two oil wells then producing; that it owned one gas well then producing; that it had two oil wells then being drilled and had two contracts let for two additional wells; that the company owned a lease thereon described as Lease No. 1, consisting of twenty-six and two-third acres; that the company had in addition to the lease described as Lease No. 1, property described as Lease No. 2 and Lease No. 3; and that the company owned all leases entirely except No. 2, in which the company had one-half interest with full control; that the company's energies and efforts will for some time to come, however, be confined to the development of what is believed to be proven territory or territory so near to production and in such position as to justify reasonable faith in production, from practically all locations drilled. But entirely irrespective of future production, account should be taken of the present production on the company's lease No. 1, where it will be noted are two good oil wells, from which oil is being put into tanks daily, sufficient to yield a dividend on our entire capitalization, and a fuel gas well, the present flow of which indicates that it will supply ample fuel for the operation of this entire lease if developed up to capacity. Contracts have been let for the drilling of two new wells on said lease. The entire production from the two wells already producing, as well as the production from all wells brought in in the future, will be converted into dividends to be distributed among the shareholders, less royalty and operating expenses. That said prospectus contained photographs purporting to show the oil wells and the gas wells owned and

operated by the company. That in furtherance of their scheme to defraud, these defendants and their agents, servants and employees, by them employed for the purpose of selling stock in said company, took this plaintiff to the State of Kansas and showed him producing wells which were held out and represented to be the property of the company.

Plaintiff further avers that he was solicited to buy stock in said company by the persons authorized and sent out by the defendants, as officers and directors of said pretended corporation and that the above and foregoing statements and representations here made to him by means of said pamphlets and prospectus and said stock salesmen and solicitors and by the defendants to induce this plaintiff to buy stock in said company; that plaintiff, knowing the official position and the high standing and character of the defendants, relied upon and believed the statements and representations so made as aforesaid and acted upon them and purchased 15,000 shares of stock in said company and paid therefor the sum of fifteen thousand dollars, and plaintiff avers that said stock was and is absolutely worthless and of no value and that the statements and representations made by the defendants and contained in the prospectus and literature aforesaid, and by the salesmen by them authorized and sent out to sell said stock, were false and untrue and known by the defendants to be false and untrue and made for the purpose of cheating and defrauding this plaintiff by inducing him to buy said worthless stock; that while the defendants represented that the said company owned two oil wells, then producing, and that the production from said oil wells, was sufficient to yield a dividend on the entire capital of $1,500,000 in truth and in fact, said company did not own any oil wells or gas wells, nor was it in possession of any such property; that while defendants in person, as well as by their agents and by their prospectus and literature aforesaid, represented and held out to this plaintiff and others that said company owned, was in posses-

sion of and operating a lease of twenty-six and two-thirds acres on which were located two oil wells and a gas well, in truth and in fact, said company did not own said lease, was not in possession of and not operating same and had no right to the possession thereof, but merely a written contract whereby said company would become the owners thereof by paying $175,000 therefor, as follows, to-wit: $5,000 cash; $20,000 on or before December 6, 1917; $25,000 on or before January 6, 1918; $25,000 on or before February 6, 1918; $25,000 on or before March 6, 1918; $25,000 on or before April 6, 1918; $25,000 on or before May 6, 1918; $25,000 on or before June 6, 1918, and that said contract provided that in default of either of said payments said contract was null and void and the amount paid forfeited.

Plaintiff avers that at the time he was induced to and did purchase stock in said company, the payments on said contract had not been made and said company did not own said lease and had no right thereto, nor the possession thereof, and was not operating same; that the income from said wells was not and could not be applied to the payment of dividends to the stockholders of the company. And plaintiff further avers that while defendants represented that the production from two oil wells on the lease known as Company's Lease No. 1, was sufficient to yield dividends on the entire capital of $1,500,000, in truth and in fact, the said company had no income from said wells or any other wells and did not own said lease and that all the money which came into the hands of said company prior to the time the plaintiff herein bought his stock, with the exception of $5000, came from persons who were induced to buy stock in said company by reason of the statements and representations made by the defendants as aforesaid. Plaintiff further avers that, while the defendants in said prospectus sought to and did impress upon the mind of the plaintiff that extreme caution had been exercised to verify all statements contained in said prospectus in confirmation of the conservative policy

of the company, in truth and in fact the statements therein were not conservative, but were false and untrue and known by the defendants to be false and untrue, and the statements made by the defendants in the said prospectus as to the conservative policy was another and further false and fraudulent statement made for the purpose of cheating and defrauding this plaintiff and other persons to whom they might seek to sell their worthless stock.

Plaintiff further avers that these defendants and the persons whom they sent out to sell stock, sought to and did induce plaintiff to go to Butler County, Kansas, and inspect the property advertised by the defendants as the property of the company, and to further their scheme to induce the plaintiff to buy said stock took plaintiff on property which contained producing oil wells and represented to the plaintiff that the oil wells belonged to and were the property of the company that were pictured and described in the prospectus aforesaid, when in truth and in fact the defendants, and each of them, well knew said wells were not the property of the company, were not operated by said company nor in the possession of said company.

Whereupon, plaintiff says that by reasons of the false and fraudulent statements, inducements and representations made by the aforesaid defendants, plaintiff was induced to and did purchase stock in the company, which was worthless, and by reason of which he has been damaged in the sum of $15,000.

Wherefore, the premises considered, plaintiff prays judgment against the defendants for the sum of $15,000 and for his costs in this behalf expended.

The answer duly filed by defendants, upon which the case was tried, is as follows, signatures and caption omitted, to-wit:

"Now come the defendants in the above entitled cause, leave of court first having been obtained, and for their amended answer to plaintiff's petition herein deny

generally each and every allegation therein contained and pray judgment.

"Further answering, defendants deny that they did any of the acts complained of or made any false representations to plaintiff, as alleged in the petition, and aver that if any such acts were committed or statements made as alleged, they were representations or assurances made concerning the character, conduct, credit and ability of the company, and were not made in writing and were not subscribed by these defendants or by any person thereto by them legally authorized.

"Further answering, defendants say that the company is a foreign corporation, organized under and by virtue of the laws of the State of Delaware, and as such is entitled to all the privileges and immunities of citizens in the State of Missouri and other states.

"Further answering, defendants say that the acts of the officers of the State of Delaware in issuing a certificate of incorporation to the company are entitled to full faith and credit in the States of Missouri and Kansas, and that Section 3039 of the Revised Statutes of Missouri 1909, which attempts to abridge the privileges and immunities of citizens of other states and attempts to deny full faith and credit to the public acts, records and judicial proceedings of other states, is in violation of Sections One and Two of Article 4 of the Constitution of the United States, which are especially pleaded and invoked in this case, and it is also in violation of Section 30 of Article 2 of the Constitution of the State of Missouri, which is especially pleaded and invoked in this case.

"Further answering, defendants say that after the company was incorporated under the laws of the State of Delaware, it applied to and was granted permission by the duly authorized officers of the State of Missouri to sell two hundred thousand dollars' worth of stock of said company in said State of Missouri.

"Further answering, defendants say that the Company was not engaged in any business in the State of

Missouri, but was operating wholly within the State of Kansas, and was duly authorized so to do under and by virtue of the laws of the State of Kansas.

"Having fully answered, defendants pray to be discharged with their costs."

The reply duly filed by plaintiff, upon which the case was tried, is as follows:

"Comes now the plaintiff, and for reply to new matter set up in defendant's answer, denies each and every allegation, averment and statement of such new matter in said answer contained and having fully replied, again prays judgment in accordance with prayer of his petition."

The real bone of contention in this case is based upon the contention made by the plaintiff that the company was organized in the State of Delaware by residents and citizens of Missouri in violation of Section 9792, Revised Statutes 1919, the material parts of which read as follows:

"Provided further, that the Secretary of State shall not license any foreign corporation to do business in Missouri when it shall appear that such corporation was organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State, as it would be a fraud upon the laws of both states, and its pretended incorporators would be held as partners, and as such become liable for the debts of the alleged corporation."

Under this statute it is insisted by counsel for plaintiff that the defendants in this case were partners and are liable as such under the facts as disclosed by the evidence.

It will not be necessary to set forth much of the evidence introduced by respondent for the purpose of proving fraud, for clearly there was an abundance of evidence tending to make a prima-facie case for him along that line, had the case been based upon such a theory. But counsel for appellants contend that there

was no evidence introduced tending to prove that they transacted any business in this State prohibited by the statute before quoted. The evidence introduced by respondent regarding the alleged business transacted in this State in violation of said statute is as follows:.

Attorney, Mr. Ward. Witness, General John T. Barker. "Q. It (the company) sold its stock here in Missouri? A. Yes, sir, had a permit to sell two hundred thousand shares of stock from the Banking Department.

"Q. And the contracts were made in Missouri? A. Yes, sir, with reference to drilling in Kansas. . . .

"Q. The contract made with the fiscal agent was made in Missouri? A. Yes, sir."

This last question and answer were objected to, because not material under the pleadings.

"Q. General, in selling stock they took a lot of notes, which they kept and handled in Kansas City in their office, didn't they?

"Mr. Harvey: I object to the question as immaterial, I can't see the purpose of the question, Your Honor. Here is allegation in the petition that we did no business in Missouri other than sell stock; we don't deny that, but admit it to be true. Now, what is the purpose of counsel's question — an attempt to show we did something else?

"Mr. Ward: What we are trying to do is to show they didn't do any oil business here, but whatever business they had to transact they transacted in Missouri and, therefore, they were incorporated in a foreign state rather than to come in and comply with the laws of the State of Missouri and do business in the State of Missouri. We don't limit it merely to selling stock. We want to show what business they did in selling their stock, and that business was done in Missouri; therefore, they ought to have complied with the laws of Missouri.

"MR. HARVEY: It seems to me that counsel and myself are in perfect accord. The allegation of his petition is that this company did no business in Missouri other than the selling of stock. I admit that allegation to be true and it is useless to offer any proof on the subject.

"BY THE COURT: I will let him answer.

"MR. HARVEY: Note an exception.

"A. Yes, sir.

"Q. And they sold those notes in Missouri, didn't they? A. Well, I think they sold some in Missouri and in Kansas, Mr. Ward."

General Barker testified that this company never intended to do business in Delaware; that the company made an arrangement with an office in Kansas in order to comply with the law in that state; that this company made its contracts in Missouri; with the fiscal agent in Missouri; that they took a lot of notes which they kept and handled in Missouri; and they sold those notes in Missouri. He identified the prospectus hereinafter mentioned and said that it was ordered by the board of directors, but was suppressed, but made no minute to that effect, as he requested them not to. And that L. C. Riley attended to all the business of this company, and he was its general manager and as such his office was in connection with the office of the company, in Kansas City, Missouri; and that the company paid for printing the "Prospectus B", and the "Prospectus B" was printed in February, 1918; that he had not talked with these defendants about becoming directors until the middle of October, 1917, but talked to them then; and that the directors had gone out and looked over this property and then gave their consent to act as such. He further states that the company had all its board of director meetings in Missouri; the officers and directors all lived in Missouri. All their contracts were made in Missouri, and their office was in Missouri, where their books were kept, and every board meeting was in Missouri.

The evidence shows that on November 3, 1917 these defendants had their first board meeting. Governor Crossley was elected president, Judge Burney vice-president, and Lee W. Wilson secretary and treasurer. At this time the evidence further tends to show not a dime had been put up by anybody, but here was a corporation organized with $1,500,000, with authority in these defendants to sell stock. Here is the president, vice-president and treasurer and all the board of directors duly organized, and nobody owning any stock except Crossley, Wilson and Burney, which had been transferred to them by the dummy directors of Dover, Delaware.

That at the first meeting of the board of directors the secretary presented an agreement between the promoter, L. C. Riley, and the company, by which the company is to purchase from Riley under a certain agreement "his contract" with the Big Walnut and his leases, and in this minute we find: "The directors of this company present at this meeting, having personally inspected Lease No. 1, commonly known as the Big Walnut property, and Lease No. 2, commonly known as the Osborn 80, and having consulted with numerous persons about lease No. 3, are of the opinion that these are valuable properties fully worth the amount asked therefor in said agreement." That said directors had been out in Kansas and examined the property with a view of purchasing it when a corporation was organized. This contract further provides that the company is to first pay off the Big Walnut Oil & Gas Company obligation and then pay for the drilling necessary, after which, payments to Riley shall be made for the sale of stock of this company. That at the second directors' meeting on the 15th of November, 1917, five of these directors paid $1,000 each for stock, and the record shows that for fear that their actually paying in money for the stock will be questioned, it will be noted that the minutes show what bank they drew their checks on, the date of the

check, how it is endorsed, and all about it. The next meeting was on November 20, 1917, and all the business transacted was that the $5000 received from the board of directors for purchase of their stock should be paid over to L. C. Riley, and Riley acknowledged receipt of it. The fourth meeting of the board of directors was had on the — day of November, 1919 in which the board transferred to Riley 442, 500 shares of stock. Thaι at the meeting of Ocotober 19, 1918, the board of directors directs that each director surrender and give to the company his capital stock, and also Counselor John T. Barker, and that ''there be $10,000 issued in lieu thereof to each of said parties.'' Now, while these directors had each purchased but a thousand shares of stock, yet, the stock or transfer book shows that Riley, the promoter, had transferred to each one of them 25,000 shares, and to Barker 25,000 shares, and therefore they each had 26,000 shares, and that is the reason they could surrender their stock and get back 10,000 shares each.

The evidence shows that the contract of sale made between the Big Walnut Oil & Gas Company and L. C. Riley was dated November 6, 1917. Yet, Riley had conveyed this contract on the 3rd of November to the board of directors of the company, when he did not have the contract for the purchase of the Big Walnut Oil & Gas Company until the 6th of November. That is true as to the leases.

Riley testified that he had talked with some of these defendants, but most of his planning was with General Barker, who was employed in the organization of the company and in carrying on its business of selling stock; that he (Barker) was to perform the legal service to procure the charter for this company, but was not employed by Riley; that he gave Barker no instructions as to the transfer of the stock of the Delaware company back to the parties in Missouri.

Governor Crossley, president of this corporation, says: "The management was largely in the hands of Mr. Riley and Mr. Barker."

Judge Burney stated that he knew that under the laws of Missouri, in order to incorporate a company for $1,500,000, it would take $750,000 in cash, or its equivalent in property.

Defendant Deal admits that in October he agreed to go into this proposition and he understood that this company that Barker wanted him to go into and become a director of was being incorporated to handle the Riley oil properties, and it was incorporated to take over the Riley oil properties.

Defendant Wilson said: "Yes, I agreed to go into the company prior to October 29th, and I was elected director in Delaware."

Defendant Gooding states: "I was invited out there to the oil fields by Mr. Barker, to look at the leases, because he was organizing the company; wanted me to be a stockholder in the company that was to be organized to handle the Riley property. I don't know what time of the month we went out there. I am lost on these dates."

"Q. And were you going to see the property with a view to incorporating the company to handle this Riley property? A. Going out there to see about taking it over."

For what purpose was this Delaware corporation organized? General Barker admits that he prepared all the legal papers in getting up this corporation, and admits that he was general counsel of and representing these defendants, and, in fact, the leading spirit in incorporating this company in Delaware. He wrote the purposes of this corporation as embodied in the certificate of incorporation. This certificate of incorporation shows the powers it had, the functions of the corporation and the business it was to be engaged in. All of this is incorporated under the third division of the certificate of incorporation and are as follows (among others):

"(a)   The nature of the business and the objects and purposes proposed to be transacted, promoted and carried on, are to do any or all of the things herein set forth, as fully and to the same extent as natural persons might or could do, 'and in any part of the world.'

"(b)   To purchase, lease or hold oil properties of all kind, tank cars, pipe lines, pumps, lands, and machinery of all kinds, etc.; to sell, transfer, or assign said leases or property or land at any time."

(Then follows a long list of things, like drilling, maintaining tanks and machinery, refineries, telephones, houses and cars, etc.)

"(c)   To deal and trade in goods, wares, merchandise and property of any and every class and description and in any part of the world.

"(d)   To acquire the good will, rights and property, and to undertake the whole or any part of the assets or liabilities of any person, firm, association or corporation; to pay for same in cash, the stock of this company, bonds or otherwise, etc.

"(e)   To apply for, purchase, hold, own, operate, etc., any and all rights, inventions, improvements and processes used in connection with or secured under letters patent or copyrights of the United States or other countries, or otherwise, and to work, operate or develop the same, and to carry on any business, manufacturing or otherwise, etc."

And in order that there may be no dispute about each one of these things enumerated, being a separate and distinct business in which this company is organized we find:

"It is the intention that each of the objects, purposes and powers specified in all of the paragraphs of the third section hereof shall be regarded as independent objects, purposes and powers."

Prospectus (Exhibits A and B) representations of defendants: The record shows, by the testimony of General Barker, that the general manager, Riley, occupied the same office in another company as he did in this. The

305 Mo.—15.

company paid for printing these exhibits. The first prospectus was printed February 20, 1918. Riley says that after he became general manager, he assisted or promoted the sale of stock and employed Hill & Preston, of Indianapolis, Indiana, to sell stock. They immediately located in Kansas City. "There was an original prospectus, which was got up by Mr. Barker, myself and some of the directors of the company. It was dated February 20, 1918. But as to who and the full particulars, got this one out, I don't know. I only know who got up the first one. There was a thousand of them ordered. They (directors) all read it over, and saw the prospectus, all of them. That is the original one I am talking about. They read it over immediately after it was prepared and it was not objected to right then."

The witness Granner said that as a salesman he used prospectus Exhibit A. They were furnished the salesmen at the office of the company, and were furnished to be used in getting subscriptions and getting stock. Pressly says that when he moved into the company's headquarters at Kansas City, he found these pamphlets or prospectus, and they were used by the salesmen to further the sale of stock, and all the sub-agents were furnished these pamphlets. There was a big bunch of them in each of the offices —several hundred in there—and nearly every day some of these defendants came into these offices, especially General Barker, Mr. Wilson, Judge Burney and Governor Crossley, and he had seen Mr. Deal there, too; that he also saw the other prospectus, to-wit, Exhibit B, and as salesman of this stock, he and his agents were informed by Mr. Riley and the directors and the prospectus, what property the Company owned. All the salesman were furnished with copies of the prospectus for use in selling stock.

Wilson admits seeing this prospectus, but assumed it was all right and made no fuss about it. The evidence also shows that these defendants, in talking to these

agents, claimed to own this property, these oil wells, gas wells, and from them the agents got their information that the oil wells as pictured in the prospectus were the wells belonging to the company, and when they went out to sell stock they believed they were telling the truth and advised this plaintiff and other purchasers that the company owned flowing wells and a gas well and owned this lease. It is further shown in evidence that the company had a large picture made of the oil wells which it claimed to own and the gas well. One of them was in defendant Wilson's office. Mr. Deal also had one, and they were set out as showing and representing oil wells actually owned by the company.

Prospectus marked "Exhibit A" and prospectus "Exhibit B" are exactly alike except in Exhibit B there are a number of letters of testimonials as to the good character and high standing of the directors. Pictures exhibited show what properties the company purported to own, photographs of actual derricks, machinery and two going wells on the property of the oil company and one gas well. It held out to the prospective buyer that this was no chance; it was a "sure-nuff" going concern and owned by the company.

Prospectus closes with this paragraph:

"This company is not responsible for statements *other* than those printed herein. . . . Extreme caution has been exercised, however, in an effort to verify all statements herein, in conformity with the conservative policy of the company."

(1)   This prospectus in enumerating its property, says: "Oil wells now producing, two; gas wells now producing, one; wells now drilling, one; contracts let for wells, two." Those statements held out that the company owned those properties, and was doing the things enumerated.

(2)   "The Missouri Mid-West Oil Company owns about a thousand acres of leases," etc.

(3)  "The Company is a producing company operating in the largest and most important productive field for standard grade oil in the world."

(4)  "Oil stock is common stock, fully paid and non-assessable."

(5)  "All net production, less upkeep, will be converted into dividends."

(6)  "The entire million five hundred thousand shares are common, fully paid and non-assessable."

(7)  "All production, after paying royalty, economic upkeep of wells and similar items, is to be marketed and converted into dividends for the benefit of the shareholders.  The royalty on all Mid-West leases is one-eighth."

(8)  "This Company owns all leases entire, except No. 2, in which the company has a half interest with full control."

(9) · "The Company owns two producing wells on its lease, one and three-fourths miles south. . . . Our gas well now has sufficient flow to operate the entire lease when fully developed. . . . Our two oil wells came in over two hundred barrels each.  The company owns these wells entire. . . . The company owns the derricks in the two oil wells, all casing and equipment, 20 h. p. J. C. gas engines, two pumps, lease houses, pump house, a good garage for two cars.  2100-barrel tanks, lead lines, etc."

(10)  "Lease No. 1, 26 2/3 acres. . . . This lease contains two producing oil wells and one gas well with room for four other locations."

(11)  "But irrespective of future production, account should be taken of the present production on the Company Lease No. 1, where it will be noted are two good oil wells from which oil is being put into the tanks daily, sufficient to yield a dividend on our entire capitalization, and a fuel gas well for the operation of the entire lease if developed up to capacity.  The entire production from two wells already producing will be converted into divi-

dends, to be distributed among the shareholders, less royalty and operating expenses."

The evidence shows all the foregoing statements were false.

I.  Counsel for appellants first contend that the petition does not state facts sufficient to constitute a cause of action against them. This contention is not tenable. The precise question was presented to this court in a case where the allegations of the petition were substantially the same as they are in this case. In that case, Booth v. Scott, 276 Mo. 1, this court held the petition did state a cause of action, and that ruling is controlling and binding in this case.

*Fraud: Petition: Cause of Action.*

II.  It is next contended that the demurrer to the evidence should have been sustained for the reason that the sale of stock, the maintenance of a general office, the holding of board meetings, the making of contracts relating to the sale of notes, all in this State, do not constitute doing business, as that term is used in Section 9792, Revised Statutes 1919, upon which respondent's petition is bottomed.

*Doing Business in This State.*

With great pains and much care I have gathered together and set forth, in the statement of this case, all the evidence preserved in this record tending to show every kind of business the company has transacted in this State. And after a summary of the same, I fail to find a scintilla of evidence tending to show the transaction of any business in this State, excepting that which relates to the sale of stock, the maintenance of a general office, the holding of board meetings, the making of contracts relating to, and the sale of notes given in connection therewith; none of those transactions are forbidden by Section 9792, Revised Statutes 1919, as I read the decisions of this State.

In the case of First National Bank v. Leeper, 121 Mo. App. 688, it is in substance held that the sale of its stock

in this State by a foreign corporation is not a prosecution of business for which the company was organized, and does not come under the statute, and a note given for such stock is not invalidated by the fact that the company has not complied with the statute.

In the case of Parker v. Wear, 230 S. W. 75, this court held that the taking of a single conveyance of real estate situated in this State and thereafter conveying it to another is not transacting business in this State within the prohibition of the statute.

In the case of Wulfing v. Cork Co., 250 Mo. 723, it was held that a lease to a foreign corporation of real estate upon which it had its office, is not void, because ' made before the company had complied with the statute authorizing it to do business in this State.

And in the case of Hogan v. St. Louis, 176 Mo. 149, it was held that a contract made with a foreign corporation entered into outside of the State is not transacting business within the State within the meaning of our corporation laws.

Also in the case of Shields v. Chapman, 240 S. W. 505, this court held that isolated transactions, commercial or otherwise, taking place between a foreign corporation domiciled in this State and citizens of another State, is not doing or carrying on business by the foreign corporation within the latter State.

And in the case of Coal & Mining Co. v. Ladd, 160 Mo. l. c. 441, it was held that the leasing of coal land for agricultural purposes and the paying of taxes upon the same by a corporation chartered for the mining and sale of coal, is not doing business as a corporation in this State within the meaning of the statute regarding a foreign corporation doing business in this State to have license to do so and have a public office.

In Hurst Automatic Switch Co. v. Trust Co., 216 S. W. 954, this court held that a foreign corporation may own property in this State before qualifying to do business herein.

Meir v. Crossley.

So in the case of Clark v. Petroleum Co., 144 Mo. App. 182, it was held that a contract made in this State by a foreign corporation which has failed to comply with the foreign corporation statute of this State is not invalid where the subject-matter of the contract has to do solely with the sale of the capital stock of such company. Such sale of stock does not constitute doing business within the meaning of that term as used in the statute. [See, also, Ryan v. Miller, 236 Mo. 496.]

After a review of these decisions it seems to me that it is perfectly clear that the selling of its stock by a foreign corporation in this State, holding board meetings, having an office, making contracts and selling notes in connection with the sale of stock, and the transaction of single business matters, is not prohibited by the statute.

It seems to be the rule that doing business is the exercise of some of the functions and carrying on of the ordinary business for which the company was organized, and that single and isolated transactions do not constitute the doing of business within the meaning of the statute.

The right of the company must be considered and determined by what it is doing or proposing now to do, and not by what it may hereafter undertake to do.

So viewing the evidence of the case under the most reasonable and practical view possible for the respondent, it seems to me that it does not make out a case for the respondent, and for that reason the court erred in not giving appellants' demurrer to the evidence.

There are quite a number of other legal propositions presented by counsel for the respective parties, but since the foregoing observations fully dispose of the case, it becomes unnecessary to decide any of them.

For the reasons stated the judgment of the circuit court is reversed, and remanded, with directions to enter judgment for the appellants. All concur; *Ragland, J.,* in a separate opinion, in which *Graves, J.,* and *James T. Blair, P. J.,* concur.

RAGLAND, J. (concurring)—The Missouri-Midwest Oil Company by contract gave to one Riley the exclusive right to market its stock. He was to sell it on a commission basis of twenty per cent. For the purpose of inducing the public to buy the stock, Riley and the brokers employed by him got out and circulated a prospectus which contained statements with reference to the assets of the corporation which were not only extravagant but false. Plaintiff being misled thereby, as he alleges, invested $15,000 in the stock which he eventually lost. Defendants constituted the board of directors of the corporation. They did not actually participate in the fraud, nor did they have any knowledge thereof at the time of its perpetration, or at the time of its intended perpetration. The evidence does not connect them with it in any way, directly or indirectly. The corporation's stock-sales agents and the corporation itself are no doubt liable for the loss sustained by plaintiff. In this action, however, plaintiff seeks to fasten liability for the actions of the corporation and its agents upon defendants, who he contends were partners because of some vice in the organization of the corporation.

So far as the evidence discloses the Missouri-Midwest Oil Company was a corporation *de jure* of the State of Delaware, and had fully complied with the laws of the State of Kansas where it was transacting the business for which it was incorporated. The principal contention, however, is that the corporation was fraudulent within the implications of Section 9792, Revised Statutes 1919, which declares that a corporation "organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this state . . . would be a fraud upon the laws of both states, and its pretended incorporators would be held as partners." There are at least two reasons why this contention must fail. First, the evidence on the part of the plaintiff affirmatively shows that the defendants had nothing whatever to do with organizing the corporation, or

causing it to be organized. They became stockholders and directors after the charter was obtained. Prior to that time they had not participated in any way, either directly or indirectly, in its promotion or organization. Second, there was no substantial evidence that the corporation was organized under the laws of Delaware "for the purpose of avoiding the laws of this State." It is difficult to understand how a purpose to avoid the laws of Missouri could have existed when the promoters of the corporation did not intend that it should transact the business for which it was incorporated in this State, and it did not thereafter do so, as pointed out in the principal opinion.

Regardless of the statute just referred to, however, the law does not permit a fraud feasor to hide behind a corporate form. Where a corporation is formed for the purpose of accomplishing a fraud or other illegal act under the guise of the fiction that a corporation is a legal entity, separate and distinct from its members, the fiction will be disregarded and the actions of the real parties dealt with as though no corporation had been formed. Such was the holding in substance in Booth v. Scott, 276 Mo. 1. In this case there was no substantial evidence that the corporation was promoted or organized for a fraudulent purpose. And there was no evidence at all that defendants, when they bought stock and become members of the board of directors, were cognizant of any fraudulent purpose on the part of the original promoters of the corporation, if any existed, or that they entertained any such purpose themselves. So far as the record discloses they were actuated by the utmost good faith, throughout their entire connection with the corporation, in their efforts to finance it and direct its activities in the prosecution of an honest and legitimate business.

For the reasons indicated I concur in reversing the judgment of the trial court. *Graves, J.,* and *Blair, P. J.,* concur.